FRANCIS REDD, Plaintiff-Appellee, *v.* WOODFORD COUNTY SWINE BREEDERS, INCORPORATED, Defendant-Appellant.

Fourth District   No. 13784

Opinion filed November 23, 1977.

GREEN, P. J., specially concurring.

Jerome Mirza & Associates, Ltd., and Robert E. McIntire, both of Bloomington, for appellant.

Peter Ferracuti & Associates, Ltd., of Ottawa (Melvin H. Hoffman, of counsel), for appellee.

Mr. JUSTICE KUNCE delivered the opinion of the court:

Woodford County Swine Breeders appeal from a trial court judgment in favor of plaintiff Francis Redd. For the reasons given, we affirm.

Woodford County Swine Breeders, Inc., contracted with Environ System, Inc., a Nebraska corporation, for Environ to be the general contractor in constructing a special facility near El Paso, Illinois, for the care and breeding of swine. The contract obligated Environ Systems to furnish all materials and labor for the work. The contract provided for payment to Environ on a percentage of completion basis. At the option of the owner, payment to subcontractors could be by joint check of the owner and general contractor.

In May 1973, Alfred Peterson, president of Environ, asked plaintiff Redd for a price on the carpentry work of the building, and an oral contract on a time and material basis with a labor rate of $10.50 per hour per man was thereafter made. Redd and Peterson orally agreed that Redd was to be paid by Peterson. According to Redd, no upset or total contract price was ever made. Kenton Zellmer, president of Woodford County Swine Breeders, was not aware of the arrangements between Peterson and Redd. The work was scheduled to start in July 1973, but because of a materials delay, Redd didn't begin work until August. Thereafter trouble arose.

It is undisputed that Peterson furnished only nominal materials and provided no supervision or payments between July and December of 1973. Redd considered the blueprints inadequate and sought consultation and help from Kenton Zellmer and Clifford Krug, two of the shareholders in the corporation. Redd was unsure about the construction of the swine building, but Zellmer had seen one elsewhere and knew how the building was supposed to look. Several alterations were made on the project. Both Zellmer and Redd tried several times from July to December to talk with Peterson, but he was unavailable. It appeared that Peterson and Environ Systems had abandoned the job and failed to honor the contract.

At the end of August, Redd requested payment from Zellmer because Peterson hadn't been seen. Redd was paid by Zellmer on August 31, 1973, by a money order. Redd executed a partial waiver of lien to Environ on August 31. Thereafter, Redd was paid by Kenton Zellmer out of the Swine Breeders' corporate checking account on 11 dates between September 13, 1973 and February 23, 1974. Ten of the 11 checks have a notation at the bottom reciting, "Environ Systems General Contract."

Redd issued lien waivers to Zellmer on the following dates: September 26, 1973; October 10, 1973; October 24, 1973; and November 8, 1973.

Waivers also were issued for August 31 and September 12, but they stated that Redd was employed by Environ Systems. Beginning with the September 26 payment, the waivers state that Redd has been employed by Kenton Zellmer for $10.50 per hour. At one point during these payments, Zellmer told Redd that he was to be paid by the Swine Breeders as had been the case previously. Zellmer admitted that Redd was being directly employed and paid by the Swine Breeders to continue working on the building. At no time were joint checks ever issued between the Swine Breeders and Environ Systems to pay Redd. All but the first payments to Redd were made out of the account of the Woodford County Swine Breeders, Inc. Zellmer was well aware that the waivers recited that Redd was being employed by Kenton Zellmer and not Environ Systems.

In late November, Redd left the job because he had not been paid for three weeks of his November work. The work for his labor in November exceeded $16,000. Redd requested payments from Zellmer. Zellmer hesitated and talked with two attorneys who were shareholders in the close corporation. According to Zellmer, the reason Redd was not paid was because Peterson of Environ told Zellmer that the amount paid to Redd had already exceeded the amount allotted for labor that Peterson had agreed to pay Redd.

After Redd had left the job, Peterson, Redd and Zellmer had a conference about completing the work on the building. Redd submitted all the manhours to them that he had spent on the job. Thereafter, Redd entered into a written contract with the Swine Breeders to complete the work. Redd testified that Zellmer told him orally that if he would finish the job he would be paid. Apparently, Redd took this to mean that he would be paid for the November work. Zellmer denied that he promised Redd that the Swine Breeders would pay him for November if he went back on the job. Redd did finish the building, and he was paid the price in the written contract, but he was not paid for the November work. Zellmer testified that before Redd went back to work, he told Redd that he would use his best efforts to see that Redd would get paid. Redd also tried to contact Peterson for the full payment for the November work.

The trial court entered an order finding that from September 26 (the date the waivers were issued to Zellmer) forward, the Swine Breeders came upon the job site and established a quasi-contractual relationship with Redd. This finding was based on the fact that the Swine Breeders paid Redd directly, accepted lien waivers from him, and paid the bills submitted by him. Judgment was entered for $16,301.25.

Defendant argues on appeal that Redd is precluded from recovery because a subcontractor cannot recover against an owner under a quasi-contract theory. (*Sloan v. Cleveland, Cincinnati, Chicago & St. Louis Ry.*

*Co.* (1908), 140 Ill. App. 31; *Walker v. Brown* (1862), 28 Ill. 378, 81 A.D. 287.) In *Vanderlaan v. Berry Construction Co.* (1970), 119 Ill. App. 2d 142, 255 N.E.2d 615, this court stated that in the absence of an express contract, a subcontractor cannot recover against the owner for there is no employment between them. That proposition has been supported elsewhere. *Baker v. Mayer* (1911), 163 Ill. App. 391; *Knickerbocker Ice Co. v. Murphy* (1895), 59 Ill. App. 39.

■■■ It is apparent that the trial court erred in basing recovery on quasi-contract. However, the reasons given for a judgment order or the findings upon which it is based, are not material and any basis appearing in the record or in law which would sustain the ruling will be sufficient (*Keck v. Keck* (1974), 56 Ill. 2d 508, 309 N.E.2d 217; *People ex rel. Scott v. United States Steel Corp.* (1976), 40 Ill. App. 3d 607, 352 N.E.2d 225). Although the issue of an express unilateral contract was not raised in the pleadings or argued in the appellate briefs, the rule states it is competent for an appellate court to affirm a trial court judgment on the basis of unargued legal grounds having factual support in the record. *Collins v. Towle* (1972), 3 Ill. App. 3d 753, 279 N.E.2d 172, *overruled on other grounds sub. nom. Romanik v. Board of Fire & Police Com.* (1975), 61 Ill. 2d 422, 338 N.E.2d 397; Ill. Rev. Stat. 1975, ch. 110A, par. 366(a)(5).

This is not the first time that an owner directly contracted with a subcontractor after the general contractor had abandoned his contract with the owner. In *Berkowsky v. Viall* (1896), 66 Ill. App. 349, the plaintiff contracted with the general contractor to supply materials for the building. During construction, the plaintiff apprehended some trouble in getting his money from the contractor. The owner told the plaintiff that he would see that the plaintiff would get paid his money for what he put in the building. Relying on that statement, the plaintiff continued to furnish material. At trial, the owner denied making the statement, but the court found that a contract existed. The court did not elaborate on what kind of contract was formed between the subcontractor and owner, but apparently it rested on an express contract. A similar factual situation has occurred elsewhere. *Kramer Bros. Co. v. Powers* (1953), 195 Va. 131, 77 S.E.2d 468.

In the instant case, Zellmer testified that he "assured" Redd that the Swine Breeders would pay him for his work. Moreover, Zellmer admitted that Redd was employed by the Swine Breeders. His statement indicates that both Redd and Zellmer felt that there was a direct employment relationship between them. Zellmer visited the site and gave Redd instructions. Redd purchased many of the materials for the project and he hired one subcontractor to do the insulation work. Krug, a shareholder, went with Redd to get a loan for Redd to buy up to $5,000 worth of materials. Redd was obviously relying on these acts as well as the

statements by Zellmer for he advanced his own money for many of the materials and he increased the amount of work force to get the building completed before the cold weather set in.

■■ While there is no testimony that indicates that an offer and acceptance was exchanged between Redd and the Swine Breeders, the evidence does indicate that an express unilateral contract was formed between the parties.

"A promise lacking mutuality at its inception becomes binding upon the promisor after performance by the promisee. [Citations.]

These contracts are sometimes called unilateral contracts. Proof of assent is not necessary on the part of the promisee. It is sufficient if the required act be performed by him." (*Plumb v. Campbell* (1888), 129 Ill.. 101, 107, 18 N.E. 790, 792.)

Zellmer's "assurance" to Redd was an offer for a unilateral contract for Redd to continue performing the work because it was apparent to all concerned that Redd was not going to be paid by Environ. Redd performed the work and completed the contract. There was no express bilateral contract, oral or written; however, under all the facts and circumstances the acts and conduct of the parties reflect an agreement where performance of the work bound Zellmer's promise to pay. The trial court reached the right result albeit under the wrong theory.

Swine Breeders argue in their reply brief that the "promises" that Zellmer made concerning payments, were occasioned after November 1973. This statement is inaccurate because Zellmer testified that in September he told Redd that Redd would be paid by the Swine Breeders for his work. Zellmer also testified that after Redd left the job in November, Zellmer told Redd that he would do his best to see that Redd got paid.

Defendant cites *Kilburg v. Petrolagar Laboratories, Inc.* (1935), 280 Ill. App. 527, as stating that the *mere* fact of direct payment by the owner to a subcontractor does not give rise to direct employment by the owner. In *Kilburg,* the owner expressly contracted with a construction company to sublet all contracts on the basis of the cost of labor and material. All the subcontractors were to be approved in writing by the owner, who was to pay all invoices for labor and material as rendered. The court held that, in view of the contract, the construction company was an original contractor and not the owner's agent. Therefore, the subcontractor could not maintain an action at law directly against the owner. In the instant case, Peterson was supposed to pay Redd for his work, but the Swine Breeders made the payments. This is a much different situation than *Kilburg* because in the instant case the express contractual relation was altered. In addition, the relationship between Redd and the Swine Breeders was much closer than in *Kilburg,* and went far beyond mere payments.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

MILLS, J., concurs.

Mr. PRESIDING JUSTICE GREEN, specially concurring;

I consider the weight of the direct and circumstantial evidence to be such that a trier of fact could reach no other conclusion than that Zellmer, acting on behalf of Swine Breeders, offered to pay plaintiff for the November work if plaintiff performed that work and that plaintiff did perform the required work in reliance on that offer. The opinion states that although the ruling of the trial court was made for the wrong reason, we may sustain it if any basis to do so appears in the record. This statement does not make clear whether affirmance would be proper if the evidence of the unilateral contract was merely strong enough to have permitted the trier of fact to have found the existence of the unilateral contract if it had addressed that issue. I consider a determination by us that the unilateral contract was proved *as a matter of law* to be a requirement of our affirmance.

This case differs from those cases where the record does not indicate the reasons for the trial court's decision. Here, the record implies that the trier of fact either did not consider the question of the unilateral contract or else decided that such a contract was not proved. If we nevertheless affirm merely upon the basis that had the trial court considered that question, it could properly have found that the contract existed, we are depriving the defendant of a factual determination to be made by the court that heard the evidence and viewed the witnesses. The ruling of the trial court may be right for the wrong reason, but it would beg the question to say that the trial court was right because it could have found that contract was made.

The language in the cases has not been explicit in stating the circumstances under which a reviewing court may affirm a ruling of the trial court made for the wrong reason. In *Keck v. Keck* (1974), 56 Ill. 2d 508, 309 N.E.2d 217, the trial court had refused to give full faith and credit to a Nevada divorce decree for the stated reason that the decree had been obtained in violation of an injunction of that court. The supreme court held that the ruling could not be sustained on that ground but that the ruling would be upheld because the evidence presented to the trial court showed that the plaintiff was not domiciled in Nevada at the time of the entry of the questioned decree. I consider that opinion to indicate that the lack of domicile had been proved as a matter of law in the trial court. In *People ex rel. Scott v. United States Steel Corp.* (1976), 40 Ill. App. 3d

607, 352 N.E.2d 225, no question of the sufficiency of evidence was involved. The decision appealed was affirmed on a different legal ground than that stated by the trial court. No decision of the supreme court nor of this court has been called to my attention which holds that a decision of the trial court rendered for a stated reason which was erroneous may be affirmed merely because the evidence was sufficient to support a factual determination that would require the decision made by the trial court. In *Schertz v. Rundles* (1977), 48 Ill. App. 3d 672, 363 N.E.2d 203, we stated that a decision of the trial court made for the wrong reason may be affirmed on appeal on other grounds only when the evidence proves those grounds as a matter of law. See also 5 Am. Jur. 2d *Appeal and Error* §728 (1962).

The point discussed in this special concurrence is obscure but I consider it to be important. To the extent that the opinion does not make clear that our affirmance is conditioned upon our determination that the contract was proved as a matter of law, I am in disagreement with the opinion.