# Illinois Official Reports

## Appellate Court

*C. Szabo Contracting, Inc. v. Lorig Construction Co.*,
2014 IL App (2d) 131328

Appellate Court
Caption

C. SZABO CONTRACTING, INC., Plaintiff-Appellee, v. LORIG CONSTRUCTION COMPANY, Defendant-Appellant (JLA Construction, Inc., Plaintiff).

District & No.

Second District
Docket No. 2-13-1328

Filed

September 29, 2014

Held

(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*)

Where defendant general contractor entered into a subcontract with plaintiff for storm sewers and other work on a construction project and plaintiff entered into a sub-subcontract with plaintiff sub-subcontractor for the pipe-jacking work related to the storm sewers, but defendant did not pay anyone after the sub-subcontractor completed the pipe-jacking work, the sub-subcontractor sued the general contractor for unjust enrichment based on a quasi-contract theory, and the trial court's judgment for the sub-subcontractor for the full amount due for the pipe-jacking work was affirmed by the appellate court, since even though an unjust enrichment claim based on quasi-contract is generally not available when an express contract governs the same matter, and such an action could not be sustained on the grounds that the general contractor enticed the sub-subcontractor to do the work or guaranteed payment, in the instant case, the circumstances warranted a judgment for the sub-subcontractor, especially when the general contractor's retention of the benefit of the completed pipe-jacking work without paying anyone amounted to unjust enrichment.

Decision Under
Review

Appeal from the Circuit Court of DuPage County, No. 10-L-956; the Hon. Dorothy French Mallen, Judge, presiding.

| Judgment | Affirmed. |
|---|---|

| Counsel on Appeal | Pedro Cervantes and Rafael Rivera, Jr., both of Tristan & Cervantes, of Chicago, for appellant. |
|---|---|
| | James F. McCluskey, Lauryn E. Parks, and Patrick R. Boland, all of Momkus McCluskey, LLC, of Lisle, for appellee. |

| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices Schostok and Hudson concurred in the judgment and opinion. |
|---|---|

**OPINION**

¶ 1 The Illinois State Toll Highway Authority (Tollway) hired defendant, Lorig Construction Company (Lorig), to be the general contractor on a construction project on Interstate 355 near the Des Plaines River. Lorig subcontracted with plaintiff JLA Construction, Inc. (JLA), to install storm sewers and perform other work. JLA, in turn, subcontracted with plaintiff C. Szabo Contracting, Inc. (Szabo), to perform pipe-jacking, which involved installing underground storm sewer pipes using tunneling instead of open excavation. After the pipe-jacking was complete and no payment was received, Szabo and JLA sued Lorig using various theories, including breach of contract and unjust enrichment based on quasi-contract. JLA voluntarily dismissed its claims, and only Szabo's quasi-contract claim went to trial. Following a bench trial, the court found in Szabo's favor and entered judgment against Lorig in the amount of $215,400. Because we conclude that Lorig would be unjustly enriched if permitted to retain the benefit that it specifically requested and agreed to pay for, we affirm.

¶ 2 I. BACKGROUND

¶ 3 On May 1, 2006, after the Tollway had hired Lorig as the general contractor on the Interstate 355 project, Lorig subcontracted with JLA to install storm sewers and perform other work on the project. The subcontract amount was approximately $2.8 million. On August 31, 2006, as an add-on to the original subcontract, Lorig authorized JLA to perform pipe-jacking. The approved price for the pipe-jacking was $1,746 per linear foot of pipe.

¶ 4 After Lorig subcontracted with JLA and authorized it to complete the pipe-jacking, Lorig discovered that JLA was not a Tollway-approved "Disadvantaged Business Enterprise" (DBE). This was problematic, because Lorig's agreement with the Tollway required it to subcontract a portion of its work to a DBE. Consequently, Lorig sent a letter to JLA requesting that it assign its subcontract to JLA & Sons, Inc., which was a DBE.

¶ 5    On March 20, 2007, in follow-up correspondence to JLA, Lorig specifically exempted the pipe-jacking from the requested assignment to JLA & Sons. Lorig indicated that the pipe-jacking was not part of the original subcontract and did not need to be completed by a DBE. Although it would permit JLA to perform the pipe-jacking, Lorig expressed concern over JLA's ability to obtain union workers to do the work, as the Tollway required. Lorig threatened to take over the work if JLA was unable to provide union workers within five days.

¶ 6    Upon receiving the follow-up correspondence from Lorig, JLA subcontracted the pipe-jacking work to Szabo. The subcontract price was $266,274, which was calculated at a rate of $1,746 per linear foot of pipe. On March 22, 2007, Szabo sent a fax on its company letterhead to Lorig indicating that it had obtained union workers and was "on the job continuing with the bore," which referenced the pipe-jacking. Lorig did not respond.

¶ 7    After the pipe-jacking was complete, JLA and Szabo sent Lorig a number of communications. On April 10, 2007, JLA submitted to Lorig a lien waiver for completed work. The waiver identified Szabo as the sub-subcontractor that performed the pipe-jacking. On April 11, 2007, Szabo faxed to Lorig a payment request of $266,274 for the pipe-jacking. On April 30, 2007, Szabo faxed to Lorig certified payroll records related to the pipe-jacking. On May 26, 2007, Szabo faxed to Lorig another payment request. JLA and Szabo received no responses.

¶ 8    On October 1, 2007, Szabo received a fax from Walter Simpson, Lorig's senior project engineer, requesting clarification about certain discrepancies in the "final numbers." Attached to the fax cover sheet were four pages that listed the pipe-jacking as well as all work completed under JLA's subcontract with Lorig before it was assigned to JLA & Sons. In response, Szabo faxed invoices and notes explaining the discrepancies, some of which pertained to the pipe-jacking and some of which pertained to work performed by JLA.

¶ 9    At the bench trial, Carl Szabo testified as follows. During the course of the Interstate 355 project, he was both president of JLA and vice president of Szabo. On behalf of JLA, Carl signed the subcontract between JLA and Szabo. Carl's brother, James Szabo, signed the subcontract on behalf of Szabo. Before the pipe-jacking began, Carl had meetings with Simpson, during which they discussed the pipe-jacking and "how soon we would be able to get the proper forces out there to do the work." According to Carl, Simpson "encouraged us to do the work." Carl also spoke with Simpson a couple of times on the job.

¶ 10   Carl testified that Szabo started working on preparations for the pipe-jacking on March 5, 2007, which was before its March 20, 2007, subcontract with JLA. The subcontract was executed because Szabo had a contract with a union and could obtain the necessary union workers. Szabo was on the project for about two months, and Carl was on the job daily.

¶ 11   On cross-examination, Carl acknowledged that, in addition to representing Szabo on the jobsite, he also worked for JLA and JLA & Sons. To that end, he was on the jobsite during the course of the entire Interstate 355 project, not just during the pipe-jacking. Carl further admitted that the workers who started preparations for the pipe-jacking on March 5, 2007, also worked for JLA.

¶ 12   Carl testified that Szabo was seeking only $215,400 in damages, instead of the full $266,274 subcontract price, because Lorig paid some of Szabo's suppliers directly. According to Carl, under industry custom, Szabo would have paid its own suppliers. One of Szabo's suppliers was Elmhurst-Chicago Stone, which supplied concrete pipe and aggregate

for the pipe-jacking. An invoice from Elmhurst-Chicago Stone listed Szabo as the customer. On cross-examination, Carl acknowledged that some of the other supplier invoices that Lorig paid in connection with the pipe-jacking listed JLA as the customer.

¶ 13   When asked about the October 1, 2007, fax from Simpson requesting clarification about the "final numbers," Carl testified that, of the four pages attached to the fax cover sheet, only three line items on the fourth page pertained to the pipe-jacking. The majority of the other work listed was performed by JLA before it assigned its subcontract with Lorig to JLA & Sons. Carl testified that Szabo never sought payment from JLA and that Lorig never paid either JLA or Szabo for the pipe-jacking.

¶ 14   David Lorig, president of Lorig, testified as follows. In August 2006, when Lorig authorized JLA to perform the pipe-jacking, the work became part of Lorig's subcontract with JLA. JLA's assignment of the subcontract to JLA & Sons contained no exclusion for the pipe-jacking. Neither JLA nor JLA & Sons notified Lorig that the pipe-jacking had been exempted from the assignment. David believed that JLA & Sons was the subcontractor responsible for the pipe-jacking and had in fact performed the work. During the course of the project, David had no knowledge that Szabo was performing the pipe-jacking.

¶ 15   When asked about the October 1, 2007, fax that Simpson sent to Szabo, David testified that it was a typical spreadsheet listing all work performed and materials used so that Lorig could "make sure everybody [was] paid the correct amount." According to David, Lorig paid for all of the work that was performed on the project, including the pipe-jacking. At the close of the project, Lorig paid "the remaining funds due" to JLA & Sons, because it was the subcontractor with which Lorig had a contract.

¶ 16   David further testified that the Tollway paid Lorig approximately $40 million for the project, which was payment in full. All work was successfully completed on the project, including the pipe-jacking. David acknowledged that a contract price of $266,274 was a reasonable price for the pipe-jacking.

¶ 17   The trial court ruled in Szabo's favor. The court found that Lorig knew that Szabo was performing the pipe-jacking, because, when it needed additional information so that it could process payment, it sent the October 1, 2007, fax to Szabo. The court further found that, although Lorig did not entice Szabo to complete the pipe-jacking, it "certainly encouraged them [sic] to get the people out there and get the work done." The court found that Lorig had not guaranteed Szabo that it would be paid for the pipe-jacking. However, the court noted, Szabo did not perform the work gratuitously and had an expectation of payment, just as "anybody working on the job expected to be paid."

¶ 18   The court found that Lorig retained a benefit, because it received payment in full from the Tollway yet presented no credible evidence that it had paid anyone for the pipe-jacking. The court did not find credible David's testimony that Lorig paid JLA & Sons for the pipe-jacking, noting that Lorig presented no documentation of payment. The court acknowledged that, prior to trial, it had granted Szabo's motion *in limine* to exclude from evidence certain documents related to payment.[1] However, the court noted, the documents at issue referenced only generic payments to JLA & Sons and did not indicate that any payment

---

[1]The court granted the motion *in limine* because Lorig had not timely tendered the documents during discovery.

was specifically for the pipe-jacking. The court reasoned that, if documentation existed establishing that Lorig paid for the pipe-jacking, it would have been easy to produce.

¶ 19    The court concluded that, under the circumstances, it would violate the principles of justice, equity, and good conscience for Lorig to retain the benefit it received while paying no one for it. The court entered judgment in Szabo's favor in the amount of $215,400. Lorig timely appealed.[2]

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, Lorig argues that the trial court applied an incorrect legal standard to the evidence. According to Lorig, when an express contract exists between a subcontractor and a sub-subcontractor, the sub-subcontractor may not pursue a quasi-contract claim for unjust enrichment against a general contractor that has benefited from its work. Lorig maintains that, in ruling in Szabo's favor, the trial court improperly determined that a sub-subcontractor may pursue such a claim if the general contractor has not paid anyone, including the subcontractor with which it contracted, for the benefit it received.

¶ 22    Szabo responds that, even if Lorig is correct that the trial court applied a standard that is unrecognized in Illinois, the judgment nevertheless is justified under existing Illinois law. According to Szabo, quasi-contractual relief is available in the face of an express contract in two scenarios: (1) when a general contractor entices a sub-subcontractor to perform or (2) when a general contractor gives a sub-subcontractor a reasonable expectation of payment. Lorig does not dispute Szabo's statement of the law but disagrees that this case falls within either scenario.

¶ 23    Generally, a reviewing court will reverse a trial court's judgment following a bench trial only if it is against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the findings are unreasonable, arbitrary, or not based on evidence. *Eychaner*, 202 Ill. 2d at 252. However, the issue of whether a trial court applied the correct legal standard to the evidence presents a question of law, which is reviewed *de novo*. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 13.

¶ 24    Unjust enrichment is not an independent cause of action but a remedy that can be based on, among other theories, a contract implied in law, otherwise known as a quasi-contract. *Chicago Title Insurance Co. v. Teachers' Retirement System*, 2014 IL App (1st) 131452, ¶ 17. A contract implied in law, or a quasi-contract, is one in which no actual agreement exists between the parties but a duty is imposed to prevent unjustness. *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 8 (2004). Generally, to be entitled to the remedy of unjust enrichment in a quasi-contract action, a plaintiff must show that he or she furnished valuable services or materials and that the defendant received them under circumstances that would make it unjust to retain the benefit. *Hayes Mechanical*, 351 Ill. App. 3d at 9. It is not enough that a defendant has received a benefit; rather, circumstances must exist such that the defendant's retention of the benefit would violate the fundamental principles of justice,

---

[2]Lorig also appealed the denial of its motion for summary judgment but concedes in its reply brief that the order is not reviewable on appeal. See *Paz v. Commonwealth Edison*, 314 Ill. App. 3d 591, 594 (2000) ("[A]n order denying a motion for summary judgment is not reviewable after an evidentiary trial, as any error in the denial is merged in the subsequent trial.").

equity, and good conscience. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160 (1989); *Hayes Mechanical*, 351 Ill. App. 3d at 9.

¶ 25 Ordinarily, the remedy of unjust enrichment based on a quasi-contract is not available when an express contract exists concerning the same subject matter. *Premier Electrical Construction Co. v. La Salle National Bank*, 132 Ill. App. 3d 485, 496 (1984); *Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.*, 104 Ill. App. 3d 357, 360 (1982). Instead, when work is done under a contract, a suit generally must be between the parties to the contract. *Daley v. G'Sell*, 102 Ill. App. 3d 548, 551 (1981). Simply because a third party has benefited from the work does not make that party liable. *Daley*, 102 Ill. App. 3d at 551; see also Restatement of Restitution § 110 (1937) ("A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person."). In other words, a party performing pursuant to a contract who is disappointed by its co-party's failure to pay generally cannot turn to a third party for compensation. *Hayes Mechanical*, 351 Ill. App. 3d at 10.

¶ 26 The parties here seem to agree that, despite this general rule, quasi-contractual relief is available in the face of an express contract when a general contractor either has enticed a sub-subcontractor to perform or has given a sub-subcontractor a reasonable expectation of payment. However, the parties have not cited, and our research has not uncovered, any Illinois case permitting quasi-contractual relief in either of these scenarios. Instead, both parties rely on *Midcoast Aviation, Inc. v. General Electric Credit Corp.*, 907 F.2d 732 (7th Cir. 1990).

¶ 27 In *Midcoast Aviation*, an aviation company hired the plaintiff to refurbish old planes and obtained financing from the defendant. *Midcoast Aviation*, 907 F.2d at 734-35. The plaintiff wanted assurances that it would be paid, so it went directly to the defendant, which gave the assurances. *Midcoast Aviation*, 907 F.2d at 735-36. After it refurbished the planes and received no payment, the plaintiff sued the defendant under a quasi-contract theory and obtained a verdict in its favor. *Midcoast Aviation*, 907 F.2d at 736. The defendant appealed, arguing that quasi-contractual relief was not available in the face of an express contract between the aviation company and the plaintiff. *Midcoast Aviation*, 907 F.2d at 739.

¶ 28 On appeal, the Seventh Circuit noted that typically, " 'if you do work pursuant to a contract with X, you don't expect that Y, a nonparty, will pay you if X defaults, merely because Y was benefited by your work.' " *Midcoast Aviation*, 907 F.2d at 739 (quoting *Goldstick v. ICM Realty*, 788 F.2d 456, 467 (7th Cir. 1986)). The court determined, however, that this was not a typical case, because the defendant not only benefited from the plaintiff's work but also enticed the plaintiff to undertake the work and fostered an expectation of payment. *Midcoast Aviation*, 907 F.2d at 739. The court held that the defendant's retention of the benefit under the circumstances constituted unjust enrichment, and it affirmed the judgment in the plaintiff's favor. *Midcoast Aviation*, 907 F.2d at 741.

¶ 29 No Illinois case has relied on *Midcoast Aviation* to allow a contracting party to pursue quasi-contractual relief from a third party who benefitted from the contracting party's performance. The only Illinois case that has cited *Midcoast Aviation* simply distinguished it on its facts. See *Hayes Mechanical*, 351 Ill. App. 3d at 10 (affirming the denial of a contractor's motion for leave to add quasi-contractual claims to its complaint against a landlord for work done pursuant to a contract with a tenant). Although Illinois courts have

allowed plaintiffs to sue nonparties to an express contract despite the existence of that contract, these cases have involved legal theories other than quasi-contract. For example, in *Swansea Concrete Products, Inc. v. Distler*, 126 Ill. App. 3d 927, 933 (1984), the court held that subcontractors could prevail in a promissory estoppel action against property owners who promised payment to the subcontractors. Similarly, in *Redd v. Woodford County Swine Breeders, Inc.*, 54 Ill. App. 3d 562, 565-66 (1977), the court held that, after a general contractor abandoned his contract with a property owner, a subcontractor could sue the owner for breach of an express unilateral contract, which arose when the owner gave assurances of payment on which the subcontractor relied.[3]

¶ 30        Moreover, regardless of whether *Midcoast Aviation* presents an accurate summation of Illinois law, the case is distinguishable. In that case, the plaintiff was unsure of its co-party's ability to pay for the renovation work, so it went directly to the defendant financier for assurances that it would be paid, and it received those assurances. *Midcoast Aviation*, 907 F.2d at 735-36. Here, by contrast, the court found that Lorig did not guarantee payment to Szabo. Although the court noted that Szabo had an expectation of payment just as "anybody working on the job expected to be paid," this is far different from requesting and receiving assurances of payment, as the plaintiff in *Midcoast Aviation* did.

¶ 31        Furthermore, although the trial court found that Lorig "certainly encouraged them [*sic*] to get the people out there and get the work done," it also found that Lorig did not "entice" Szabo to complete the pipe-jacking. To the extent that Lorig encouraged anyone to complete the pipe-jacking, the evidence suggests that it encouraged JLA, not Szabo. All of Lorig's communications regarding completion of the pipe-jacking occurred prior to March 20, 2007, the date on which JLA subcontracted the work to Szabo. Moreover, all of Lorig's correspondence prior to that date was addressed to JLA, including its letter threatening to take over the pipe-jacking. Although Szabo sent a fax to Lorig on March 22, 2007, indicating that it was "on the job continuing with the bore," Lorig did not respond. In fact, other than the October 1, 2007, fax, there was no evidence of any communications from Lorig to Szabo.

¶ 32        Similarly, although Carl testified that he met with Simpson to discuss the pipe-jacking and that Simpson "encouraged us to do the work," Carl testified that these meetings took place before the commencement of the pipe-jacking. According to Carl, the pipe-jacking work began on March 5, 2007, 15 days before JLA subcontracted with Szabo and before there was any indication that Szabo would be involved in the project. Thus, when he met with Simpson, Carl must have acted in his capacity as president of JLA, as Szabo was not in any way involved in the project. Based on these considerations, to the extent that the trial court found that Lorig encouraged Szabo to perform the pipe-jacking, its finding is against the manifest weight of the evidence.

¶ 33        The trial court's finding that Lorig knew that Szabo was performing the pipe-jacking–a finding based on Simpson's October 1, 2007, fax to Szabo–does not alter our conclusion. In

---

[3]The parties also cite *Woodfield Lanes, Inc. v. Village of Schaumburg*, 168 Ill. App. 3d 763 (1988), as a case recognizing a guarantee of payment as a circumstance permitting a quasi-contract claim for unjust enrichment. However, no express contract existed in *Woodfield Lanes*, which involved an ordinance that required the village to compensate the plaintiff landowner for expenses incurred in constructing a sewer and a water main. *Woodfield Lanes*, 168 Ill. App. 3d at 767-68. Therefore, the case is of little assistance here.

*Premier Electrical Construction*, the court explained why mere knowledge that work is being performed is insufficient:

> "As a general rule, the doctrine of unjust enrichment does not apply where the entire work is contracted for and placed under a general contractor who has the power to employ whom he chooses, because in such circumstances the owner has the right to presume that work is being done for and on behalf of the contractor." *Premier Electrical Construction*, 132 Ill. App. 3d at 496.

Therefore, even if Lorig knew that Szabo was performing the pipe-jacking, this would not entitle Szabo to pursue a quasi-contract claim against Lorig. Lorig subcontracted the pipe-jacking work to JLA and had the right to presume that the work was being done for and on behalf of JLA.

¶ 34    In sum, we cannot affirm the trial court's judgment on the basis that Lorig enticed Szabo to perform or guaranteed payment. Therefore, resolution of this case turns on whether Szabo was entitled to quasi-contractual relief because Lorig received the performance it requested but paid no one for it. Although Lorig maintains that Szabo is not entitled to relief on this basis, it does not contest the trial court's finding that it paid no one for the pipe-jacking.

¶ 35    No Illinois case has addressed whether a party to a contract may pursue quasi-contractual relief against a nonparty to the contract on the basis that the nonparty requested and received a benefit but has paid no one for it. A number of out-of-state cases have addressed this factual scenario. Some cases conclude that a party is unjustly enriched when it retains the benefit that it requested but does not pay anyone for it. See *Flooring Systems, Inc. v. Radisson Group, Inc.*, 772 P.2d 578 (Ariz. 1989) (holding that a subcontractor could pursue quasi-contractual relief against a property owner when the owner paid no one for the work for which it contracted with a general contractor); *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898 (Mich. Ct. App. 2006) (holding that a general contractor was unjustly enriched when it retained materials supplied by a subcontractor's supplier but paid no one for them); *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, 129 N.M. 200, 3 P.3d 695 (holding that, where homeowners had not paid a very "substantial amount" of funds due to a general contractor, the subcontractors could pursue quasi-contractual relief against the homeowners).

¶ 36    Other cases conclude that a general contractor's or an owner's failure to pay for a benefit received is not sufficient by itself to allow an unpaid subcontractor to recover under an unjust-enrichment theory. See *Bennett Heating & Air Conditioning, Inc. v. NationsBank of Maryland*, 674 A.2d 534, 540-41 (Md. 1996) (holding that a subcontractor's unjust enrichment claim against an owner does "not turn on whether the owner has fully paid the general contractor"); *Farwest Steel Corp. v. Mainline Metal Works, Inc.*, 741 P.2d 58, 65 (Wash. Ct. App. 1987) (holding that a subcontractor's supplier did not unjustly enrich a general contractor even though the general contractor failed to pay the subcontractor in full for the supplied materials).

¶ 37    Many of the cases addressing this factual scenario contain little discussion, which makes reasoned analysis of their holdings difficult. In order to determine whether Szabo is entitled to relief, we must explore the considerations for and against permitting relief in this situation. Ultimately, we conclude that the considerations in support of permitting relief outweigh the considerations in opposition.

¶ 38    In support of permitting relief in this situation is the consideration that, if a general contractor or a property owner receives the very performance for which it contracted with another, then, absent some valid defense to payment, it would receive a windfall if allowed to retain the benefit while paying no one for it. Reflecting this concern, section 25 of the Restatement (Third) of Restitution and Unjust Enrichment provides that quasi-contractual relief to prevent unjust enrichment is available where liability would not subject the defendant to a "forced exchange." Restatement (Third) of Restitution and Unjust Enrichment § 25 (2011). The comments to section 25 explain that, in requiring a party to pay for a benefit that it requested, "there is in principle no forced exchange to the extent that the defendant's liability in restitution is congruent with his own bargain." Restatement (Third) of Restitution and Unjust Enrichment § 25 cmt. b (2011). The comments distinguish this scenario from one in which a defendant has not requested the performance in question. In the latter situation, permitting recovery would violate "restitution's fundamental reluctance to require a defendant to pay money, at a price set by someone else, for goods and services he had no adequate opportunity to select or to refuse." Restatement (Third) of Restitution and Unjust Enrichment § 25 cmt. b (2011).

¶ 39    The availability of quasi-contractual relief in the presence of an express contract often turns on concerns of double recovery or double liability. See *Pendleton v. Sard*, 297 A.2d 889, 895 (Me. 1972) (noting that a property owner would be subjected to double liability if required to pay a general contractor and a subcontractor for the same work); J.R. Kemper, Annotation, *Building and Construction Contracts: Right of Subcontractor Who Has Dealt Only With Primary Contractor to Recover Against Property Owner in Quasi Contract*, 62 A.L.R.3d 288 (1975) (noting the "commonly cited" consideration "that the landowner had already paid to the general contractor all, or a very substantial part, of the amount due the latter under the terms of the primary agreement between them, and that to allow the subcontractor to recover from the landowner would therefore be to require him to pay twice"). In this vein, a number of courts have held that, where a general contractor or an owner has paid someone for the benefit received, there is no unjust enrichment. See, *e.g.*, *Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co.*, 695 So. 2d 383, 390 (Fla. Dist. Ct. App. 1997) ("[W]here an owner has given consideration for the subcontractor's work by paying out the contract price for the work, an unpaid subcontractor's claim that the owner has been unjustly enriched must fail."); *DJ Painting, Inc. v. Baraw Enterprises, Inc.*, 776 A.2d 413, 417-18 (Vt. 2001) (holding that a property owner was not unjustly enriched where it paid the general contractor for the value of work completed by a painting subcontractor). These cases imply that, if the general contractor or owner had not paid anyone for the benefit received, it would have been unjustly enriched. See Restatement (Third) of Restitution and Unjust Enrichment § 25, Reporter's Note b (2011) ("Most of these decisions carry the reasonable implication, even if they do not state directly, that the plaintiff's restitution claim would be viable if the benefits in question had not been paid for.").

¶ 40    Supporting the opposite result is the consideration that, when an express contract exists, it defines the parties' duties and allocates the risks between them. One Illinois court has explained the basis for the general rule that quasi-contractual relief is unavailable in the presence of an express contract as follows:

"When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow. Quasi-contract is not a means for shifting a risk one has assumed under contract." *Industrial Lift Truck*, 104 Ill. App. 3d at 361.

Some courts have noted that, when a party chooses to contract with only one party, it assumes the risk that its co-party will not pay. See *Hayes Mechanical*, 351 Ill. App. 3d at 13 (reasoning, in part, that a contractor could not pursue quasi-contractual relief against a landlord for services performed under a contract with a tenant, because the contractor assumed the risk of loss when it contracted with the tenant alone); *Kemp v. Majestic Amusement Co.*, 234 A.2d 846, 848 (Pa. 1967) (holding that a landlord was not unjustly enriched by services that a contractor performed for a tenant, because, among other reasons, the contractor relied solely on the financial credit of the tenant when contracting to perform the services). Permitting a subcontractor to pursue quasi-contractual relief against a nonparty to a contract in essence allows the subcontractor to shift the risk of loss to the nonparty. See *Kemp*, 234 A.2d at 848 (reasoning that the contractor could not "shift the loss" to a landlord who was a nonparty to the contract).

¶ 41     Another rationale supporting the denial of quasi-contractual relief when an express contract exists is protection of the "rights of choice and personal autonomy." *Hayes Mechanical*, 351 Ill. App. 3d at 11 (citing *DCB Construction Co. v. Central City Development Co.*, 965 P.2d 115, 121 (Colo. 1998)). "[O]rdinarily, an owner [or a general contractor] should not be forced into a legal relationship with someone other than the partner he has chosen." *Hayes Mechanical*, 351 Ill. App. 3d at 11 (citing *DCB Construction Co.*, 965 P.2d at 121).

¶ 42     Having weighed the various considerations for and against permitting quasi-contractual relief in this situation, we conclude that Lorig's retention of the benefit of the pipe-jacking without paying anyone for it constitutes unjust enrichment and that Szabo's subcontract with JLA is not a barrier to recovery. Most importantly, Lorig received the exact performance that it requested and agreed to pay for, and it does not dispute that it paid no one for the work. Requiring Lorig to compensate Szabo for the pipe-jacking results in no unfairness or "forced exchange," because Lorig is paying for the exact service it requested at the price it agreed to pay. See Restatement (Third) of Restitution and Unjust Enrichment § 25 cmt. b (2011) ("[T]here is in principle no forced exchange to the extent that the defendant's liability in restitution is congruent with his own bargain."). Lorig agreed to pay JLA $1,746 per linear foot of concrete sewer pipe jacked in place, and JLA subcontracted the pipe-jacking to Szabo at that price. At trial, Lorig conceded that the pipe-jacking was completed satisfactorily and that the total price for the work was reasonable. Furthermore, Lorig received payment in full from the Tollway. Under these circumstances, requiring Lorig to compensate Szabo does not violate "restitution's fundamental reluctance to require a defendant to pay money, at a price set by someone else, for goods and services he had no adequate opportunity to select or to refuse." Restatement (Third) of Restitution and Unjust Enrichment § 25 cmt. b (2011).

¶ 43     In addition, under the facts of this case, there is no risk of double liability or double recovery. JLA dismissed its claims against Lorig more than one year ago and thus would be

unable to obtain a judgment against Lorig. See 735 ILCS 5/13-217 (West 1994) (a party has one year to refile an action that has been voluntarily dismissed).[4] Likewise, Szabo never requested payment from JLA and clearly has no intention of seeking relief from it. Thus, there is no risk that Lorig will be required to pay for the pipe-jacking twice or that Szabo will be compensated twice.

¶ 44    Furthermore, by obtaining recovery, Szabo is not shifting to Lorig any risk that it assumed under its subcontract with JLA. In *Industrial Lift Truck*, the plaintiff assumed the risk that the party with whom it contracted would exercise its right to terminate the contract before the plaintiff was fully compensated for work completed. *Industrial Lift Truck*, 104 Ill. App. 3d at 361. When its co-party terminated the contract, the plaintiff improperly attempted to avoid the risk by pursuing quasi-contractual relief. *Industrial Lift Truck*, 104 Ill. App. 3d at 361. Here, by obtaining relief from Lorig, Szabo is not shifting any similar risk to Lorig.

¶ 45    Although Szabo contracted only with JLA–and thus, strictly speaking, assumed the risk that JLA might not pay it for the completed pipe-jacking–permitting Szabo to prevail on its quasi-contract claim does not impose on Lorig any obligation beyond the obligation that it agreed to incur. The cases that cite a party's assumption of the risk of nonpayment as support for denying quasi-contractual relief in the presence of an express contract typically involve a third party who incidentally benefited from the plaintiff's performance. See *Hayes Mechanical*, 351 Ill. App. 3d at 13 (involving a quasi-contract claim against a landlord who neither requested nor agreed to pay for renovation work performed on behalf of a tenant); *Kemp*, 234 A.2d at 848 (same). Under those circumstances, shifting the risk of loss to the benefitting third party would impose on that party an obligation that it never agreed to incur. Here, by contrast, Lorig specifically requested and agreed to pay for the pipe-jacking. Thus, requiring Lorig to compensate Szabo for the pipe-jacking does not exceed the obligation that Lorig agreed to incur.

¶ 46    Similarly, protection of the rights of choice and personal autonomy is not a significant concern under the facts of this case. Although Lorig chose to contract with JLA, Lorig received from Szabo the very performance that it requested and agreed to pay for. JLA subcontracted the work to Szabo because Lorig threatened to take over the pipe-jacking if JLA could not obtain union workers within five days and Szabo had a union contract and was able to obtain the union workers on short notice. Under these circumstances, liability for the benefit Lorig requested and received cannot be avoided out of concern for its rights of choice and personal autonomy. These rights have not been violated in any significant sense.

¶ 47    At oral argument, Lorig asked us to impose a requirement that, before a contracting party in Szabo's position is entitled to pursue quasi-contractual relief from a nonparty, the party must have exhausted its contractual remedies. Some out-of-state cases have imposed such a requirement. See *Commerce Partnership 8098 Ltd. Partnership*, 695 So. 2d at 389 (imposing two requirements for a subcontractor's quasi-contract action against an owner: (1) exhaustion of remedies against the contractor and (2) the owner's receipt of the benefit conferred without paying consideration to anyone); *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966) ("[B]efore recovery can be had against the landowner on an unjust enrichment

---

[4]As this court has explained, "[t]he version of section 13-217 in effect is the version that preceded the amendments to Public Act 89-7 (Pub. Act 89-7, (eff. March 9, 1995), which our supreme court found unconstitutional in its entirety." *Domingo v. Guarino*, 402 Ill. App. 3d 690, 698 n.3 (2010).

theory, the furnisher of the materials and labor must have exhausted his remedies against the person with whom he had contracted ***.").

¶ 48 We decline to impose an exhaustion-of-contract-remedies requirement under the facts of this case. As we have discussed, the circumstances of this case render inapplicable the rationales underlying the general prohibition against quasi-contractual relief in the presence of an express contract. Furthermore, our supreme court has recognized that "[t]he doctrine of unjust enrichment underlies a number of legal and equitable actions and remedies, including the equitable remedy of constructive trust and legal actions of *assumpsit* and restitution or quasi-contract." *HPI Healthcare Services*, 131 Ill. 2d at 160. Where, as here, a party seeks money damages under an unjust enrichment theory in a quasi-contract action, the plaintiff's action is one "at law for a monetary recovery." *Partipilo v. Hallman*, 156 Ill. App. 3d 806, 810 (1987). Thus, the general rule that a party must exhaust its legal remedies before pursuing an equitable remedy is inapplicable. *Partipilo*, 156 Ill. App. 3d at 810. We see no reason to require Szabo to exhaust its contractual remedies before pursuing quasi-contractual relief against Lorig.

¶ 49                                       III. CONCLUSION
¶ 50 We conclude that Lorig's retention of the benefit it specifically requested and agreed to pay for, without paying anyone for it, constituted unjust enrichment. Therefore, we affirm the judgment of the circuit court of Du Page County.

¶ 51 Affirmed.