2022 IL App (2d) 210054-U
No. 2-21-0054
Order filed June 24, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| JOSEPH J. LEGAT, | ) | Appeal from the Circuit Court |
| | ) | of Lake County |
| Plaintiff-Appellant and Cross-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-L-797 |
| | ) | |
| LEGAT ARCHITECTS INC., | ) | |
| | ) | |
| Defendant-Appellee and | ) | |
| Cross-Appellant, | ) | Honorable |
| | ) | Mitchell L. Hoffman, |
| (Timothy M. Johnston, Cross-Appellee). | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court erred when it dismissed plaintiff's breach of oral contract and promissory estoppel counts, where the counts were not barred by the statute of frauds or the statute of limitations. The court similarly erred when it dismissed plaintiff's unjust enrichment count, which was pleaded in the alternative to the breach of oral contract count and did not refer to the existence of an express, oral contract. The circuit court properly dismissed plaintiff's defamation count where plaintiff failed to properly allege defamation *per se* or *per quod* concerning certain of defendant's statements, and where other of defendant's statements constituted nonactionable opinions. The court did not abuse its discretion in imposing a $3000 sanction against plaintiff for failing to ensure his conversion count was well grounded in fact.

¶ 2    Plaintiff, Joseph J. Legat, who was the previous owner of defendant company, Legat Architects Inc., appeals the circuit court of Lake County's orders dismissing certain counts of plaintiff's second and third amended complaints, which, among other things, alleged breach of an oral contract, promissory estoppel, defamation, and unjust enrichment. Defendant cross-appeals the trial court's adjudication of its motion for sanctions. We affirm in part, reverse in part, and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4    Plaintiff's second and third amended complaints, which were filed on August 29, 2019, and January 29, 2020, respectively, alleged the following facts. Around January 1, 1997, plaintiff and defendant executed a written consulting agreement (written agreement), specifying that plaintiff would "perform consulting and related services" for defendant, such as engaging in conferences, preparing preliminary studies, projecting design studies, developing and maintaining client relationships, assisting in document preparation, and completing "strategic planning." The term of the written agreement was to span from January 1, 1997, to December 31, 2006. As compensation for his consulting services, the written agreement specified that plaintiff would be paid "at the base rate of $108,008 per year, payable in monthly installments of $8,334.00." This compensation would "be increased annually at a percentage rate of the lesser of the previous year's inflation rate *** or the average percentage rate increase of salaries paid to the shareholders of [defendant] in the same year." Additionally, "[i]n the years when shareholders of [defendant] receive bonuses for their services provided to [defendant]," plaintiff would receive a bonus "equal to 10% of the sum of all such shareholder bonus amounts." Furthermore, the written agreement specified that defendant would "reimburse [plaintiff] for all reasonable out of pocket expenses incurred in the performance of his duties," up to $2000 per month.

¶ 5    On December 28, 2006, plaintiff and defendant's then president, Wayne Machnich, had a conversation outside of defendant's offices, in which they acknowledged that the written agreement would end soon. During the conversation, plaintiff "expressed to *** Machnich his then-present intent to leave [defendant] to open his own architectural sculpture business." Plaintiff also had a desire to "open his own architectural firm," which plaintiff believed was "known to [d]efendant or suspected by [d]efendant." Defendant asked plaintiff to continue working for defendant, offering to extend the written agreement "on its original terms." Plaintiff orally accepted defendant's offer, and the parties entered into a second consultation agreement (oral agreement).

¶ 6    In 2007, defendant indicated to plaintiff "that financial support was necessary to shore up [defendant], and [p]laintiff agreed to lend [d]efendant $500,000, which [d]efendant later repaid."

¶ 7    Plaintiff continued performing under the oral agreement and "repeatedly advanced his own funds" in performing his duties. Specifically, plaintiff paid for "membership dues, sponsorships, luncheons, seminars, and travel," regularly spending over $2000 per month. Defendant also "performed all of the requirements of the *** [oral a]greement," except that, "after the second year of the [oral agreement,]" defendant had "failed to pay the annual salary increases" and bonuses, as referenced in the parties' original, written agreement. Defendant explained to plaintiff that it could not fulfill these aspects of the written agreement, because "it had fallen on hard financial times." Accordingly, defendant also failed to meet its obligation of paying defendant up to $2000 per month to cover his work expenses. Still, aside from those deviations, defendant continued "making regular payments [to plaintiff] until on or about December 22, 2017."

¶ 8    "[O]n or about December 22, 2017," the parties' relationship soured, and defendant "unilaterally terminated the [oral] agreement." Around that date, "[d]efendant ordered all of its

offices' doors to be locked nationwide, to prevent the violent entry of [p]laintiff," who "was labeled as locked out." Defendant also instructed its employees to "inform inquirers that [p]laintiff was 'locked out.' "

¶ 9    Soon afterwards, in either "late December 2017 or early January 2018," defendant's then-current president, Patrick Brosnan, and one of defendant's lead shareholders, Jeffrey Sronkowski, "communicated to members of the board of directors [(board)] of [the] College of Lake County[ ]that [p]laintiff was erratic to the point that [d]efendant ordered all of its offices in the country to lock their doors to prevent [p]laintiff's violent entry." Defendant purportedly made similar communications to the College of Lake County board "in the spring of 2018[ ]and May and June of 2019." In the spring of 2018, defendant again made similar comments to the president and board of Harper College. Prior to defendant making these communications, plaintiff had "enjoyed an excellent professional reputation with both colleges." However, after defendant made these comments to both colleges, "[p]laintiff was shunned and his *** qualifications for architectural services were rejected out of hand."

¶ 10    On August 29, 2019, plaintiff filed his second amended complaint alleging breach of contract (count I), breach of performed oral contract (count II), promissory estoppel (count III), defamation (count IV), conversion (count V), and unjust enrichment (count VI). On September 27, 2019, defendant moved to dismiss counts I, II, IV, and VI of the second amended complaint under section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2018)) (Code). On January 15, 2020, the circuit court granted defendant's motion, reasoning that the statute of frauds precluded enforcement of the oral agreement. The circuit court dismissed counts I, II, and IV with prejudice, and dismissed count VI without prejudice.

¶ 11    On January 29, 2020, plaintiff filed its third amended complaint, in which plaintiff repleaded counts III and VI—the promissory estoppel and unjust enrichment counts. On March 11, 2020, defendant filed a motion to dismiss counts III and VI of the third amended complaint. Attached to the motion to dismiss, defendants included an affidavit completed by Bernardo Desimone, defendant's Chief Operating Officer. Defendant attached a stock purchase sale agreement and stock redemption agreement to the affidavit, establishing that, on January 10, 1997, plaintiff sold all of his shares in his prior company—which shared his name—to several of defendant's employees and to defendant itself. A 1997 promissory note was also attached to the affidavit, purportedly governing the repayment of the $500,000 loan that plaintiff had previously made to defendant. On August 4, 2020, the circuit court granted defendant's motion, finding both that the statute of frauds precluded plaintiff's promissory estoppel count and that plaintiff's unjust enrichment count improperly alleged elements of an express contract. Consequently, the circuit court dismissed counts III and VI with prejudice.

¶ 12    On September 4, 2020, defendant filed its answer to plaintiff's sole remaining count of conversion. On September 25, 2020, defendant deposed plaintiff concerning plaintiff's conversion count, and in doing so, came to believe that plaintiff's allegations under the count lacked an adequate basis in fact. On October 2, 2020, shortly after the deposition, plaintiff filed a motion to voluntarily nonsuit the action. On October 19, 2020, defendant filed its motion for sanctions against plaintiff, arguing that plaintiff's conversion count lacked an adequate basis in fact and plaintiff's counsel failed to make a "reasonable inquiry" into the matter. In the motion, defendant requested that, if the court agreed that plaintiff's conduct was sanctionable, it be entitled to file a fee petition to establish all of its fees that were expended in defending itself against the conversion count. The next day, on October 20, 2020, the circuit court granted plaintiff's motion to nonsuit

the action. On November 17, 2020, plaintiff filed a notice of appeal, but, on December 4, 2020, this court dismissed the appeal as premature, because defendant's motion for sanctions remained pending before the circuit court. On January 6, 2021, the circuit court entered an order granting defendant's motion for sanctions, imposing a sanction in the amount of $3000 against plaintiff and his counsel. Plaintiff timely appeals, and defendant timely cross-appeals.

¶ 13                                II. ANALYSIS

¶ 14    On appeal, plaintiff raises four primary arguments: 1) that the trial court erred when it found that the statute of frauds precluded plaintiff's breach of oral contract count; 2) that neither the statute of frauds nor the applicable statute of limitations precluded plaintiff's count of promissory estoppel; 3) that, for several reasons, the circuit court erred in dismissing plaintiff's defamation count; and 4) that, for several reasons, the circuit court erred in dismissing plaintiff's unjust enrichment count. On cross-appeal, defendant argues that the circuit court abused its discretion in imposing the sanction of $3000. We address these arguments in turn.

¶ 15                        A. Count II—Breach of Oral Contract

¶ 16    First, because plaintiff sufficiently alleged that it had fully performed its obligations under the oral agreement, the circuit court erred when it found that the statute of frauds precluded enforcement of the oral agreement and consequently dismissed count II of the second amended complaint.

¶ 17    Pursuant to the Frauds Act:

       "No action shall be brought *** upon any agreement that is not to be performed
    within the space of one year from the making thereof, unless the promise or agreement
    upon which such action shall be brought, or some memorandum or note thereof, shall be

in writing, and signed by the party to be charged therewith, or some other person thereunto

by him lawfully authorized." 740 ILCS 80/1 (West 2018).

The statute "tracks the language of the original English Statute of Frauds and Perjuries" and seeks to bar "actions based upon nothing more than loose verbal statements." *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 489 (1997). In adopting the statute, the legislature concluded that, "while the technical elements of a contract may exist, certain contracts should not be enforced absent a writing. It functions more as an evidentiary safeguard than as a substantive rule of contract." *Id.* Accordingly, the statute of frauds serves "to protect not just the parties to a contract, but also—perhaps more importantly—to protect the fact finder from charlatans, perjurers and the problems of proof accompanying oral contracts." *Id.*

¶ 18    In determining whether a contract falls within the statute of frauds, many courts consider whether a contract is capable of being performed within a year, "regardless of how unlikely it is that it will actually be performed within one year." *Id.* at 489-490. "Under this interpretation, the actual course of subsequent events and the expectations of the parties are entirely irrelevant" and "[a] contract for lifetime employment would then be excluded from the operation of the statute because the employee could, in theory, die within one year, and thus the contract would be 'capable of being performed.' " *Id.* at 490.

¶ 19    Our supreme court has nonetheless found this reasoning to be "hollow and unpersuasive." *Id.* Instead, because a lifetime employment contract inherently "anticipates a relationship of long duration—certainly longer than one year," our supreme court found that "the better view is to treat the contract as one 'not to be performed within the space of one year from the making thereof.' " *Id.* at 490-491. Accordingly, "writing is required for the fair enforcement of lifetime employment contracts." *Id.* at 491. This same reasoning has also been applied to employment contracts of an

unknown duration. *Robinson v. BDO Seidman, LLP,* 367 Ill. App. 3d 366, 371 (2006). We review *de novo* the trial court's judgment on a motion to dismiss under either sections 2-615 or 219 of the Code of Civil Procedure (735 ILCS 5/1-101 *et seq.* (West 2020)) *Krilich v. American National Bank & Trust Co. of Chicago*, 334 Ill. App. 3d 563, 571 (2002).

¶ 20    Here, the parties dispute whether the oral agreement falls within the statute of frauds. According to plaintiff, enforcement of the oral agreement is not precluded by the statute of frauds, because it "was to continue for as long as [plaintiff] was needed by *** [d]efendant." In other words, plaintiff characterizes the oral agreement as an at-will employment contract instead of an employment contract of an unknown duration. Therefore, pursuant to plaintiff's logic, because an at-will employment contract does not implicate the statute of frauds, the trial court erred in finding that the statute of frauds rendered the oral agreement unenforceable for purposes of plaintiff's breach-of-contract count.

¶ 21    Plaintiff's argument ignores pertinent record evidence. In plaintiff's second amended complaint, which the circuit court considered in dismissing plaintiff's count II, plaintiff clearly alleged that, prior to entering the oral agreement, defendant "offered to extend the [written] [a]greement *by [ten] years* on the same terms stated in [the written agreement]." (Emphasis added.) Plainly, if the parties agreed that plaintiff would continue working for defendant for an additional ten years, such an agreement was not for at-will employment and could not be completed within the span of one year, meaning the agreement would fall under the statute of frauds.

¶ 22    Nonetheless, in *Mapes v. Kalva Corp.*, 68 Ill. App. 3d 362, 368 (1979), this court explicitly found that "complete performance on the part of one of the parties to [an] alleged [oral employment] contract will prevent application of the statute of frauds." There, the plaintiff brought an action against the defendant employer for a breach of an employee contract. *Id.* at 364. "The

only writings in support of the alleged employment contract *** were some of [the plaintiff's] paycheck stubs, and[,] at oral argument[, the] plaintiff's attorney admitted that he could not prove the existence of any written contract."

¶ 23    Prior to trial, the plaintiff testified that he had met with the president of the defendant's parent company in October 1972, and that the president "offered [the] plaintiff a new position at a salary and bonus which the two men agreed upon." The agreement provided that the plaintiff's "salary for fiscal 1973 (November 1, 1972[,] to October 31, 1973[,]) was to be $25,000," and that, "if the [defendant] were to realize a profit of at least $50,000 for fiscal 1973[,] [the] plaintiff was to receive 5% Of [*sic*] profit achieved and a salary increase of $2500 to fiscal 1974 (November 1, 1973[,] to October 31, 1974)." The contract included a similar provision entitling the plaintiff to further compensation if the defendant employer achieved a profit of at least $100,000 for the following fiscal year. Although the defendant's profits for 1973 totaled $133,000, the plaintiff only received a bonus for $2500, far less than the 5% previously agreed upon. *Id.* In December 1973, the plaintiff was told that his salary would be reduced to $12,000 per year. *Id.*

¶ 24    We noted that the parties' 1972 agreement "involved two separate one[-]year contracts, each with its own terms, one for fiscal 1973 and one for fiscal 1974." *Id.* at 368. We also noted that the contract for fiscal 1973 was made in October 1972, and that, pursuant to the statute of frauds, "any contract provisions which could not have been performed until after early October[] 1973, [fell] directly within the scope of the statute [of frauds] and [were] unenforceable unless there [was] some reason to not apply the statute." *Id.* at 367-68.

¶ 25    In analyzing whether plaintiff's performance under the contract "made the statute of frauds inapplicable to [that] case," we noted that the doctrine of partial performance does not bar an application of the statute of frauds on "[n]ormal employment contracts, such as the one [there]."

*Id.* at 365-68. "However," we noted, "complete performance on the part of one of the parties to the alleged contract will prevent the application of the statute of frauds." *Id.* Because the plaintiff alleged that he had worked for defendant for the entire 1973 fiscal year, we found that any claims relating to the contract governing that year were not barred by the statute of frauds. *Id.* at 368-369. Accordingly, the plaintiff was entitled to collect his bonuses and full salary as specified in that contract. *Id.*

¶ 26    Here, like the plaintiff in *Mapes*, plaintiff alleged that he fully performed under the applicable oral agreement. Defendant does not seem to rebut this allegation, and, in any event, by arguing that count II should be dismissed under section 2-619(a)(7) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(7) (West 2018)), defendant has acknowledged plaintiff's allegations under count II as being true.  *Becker v. Zellner*, 292 Ill. App. 3d 116, 122 (1997) (find that "the moving party under section 2-619 'admits the legal sufficiency of the complaint but asserts an affirmative defense or other matter that avoids or defeats the claim.' " (citing *Brock v. Anderson Road Ass'n*, 287 Ill. App. 3d 16, 21 (1997))). Accordingly, because plaintiff has alleged full performance under the oral agreement, the circuit court erred when it concluded that the statute of frauds precluded enforcement of the oral agreement. For this reason, the court also erred in dismissing count II of plaintiff's second amended complaint.

¶ 27    Defendant attempts to distinguish *Mapes* on wholly cosmetic grounds, suggesting that it is inapplicable because there were two one-year contracts there as opposed to one 10-year contract here. However, this distinction is irrelevant, especially given the described similarities between the 1973 fiscal year contract there—which was entered into more than one year before its anticipated completion date—and the oral agreement here. *Mapes*, 68 Ill. App. 3d at 368-369. Both here and in *Mapes*, the relevant contracts were incapable of being performed in their entirety within

the scope of a year, meaning they would normally fall under the statute of frauds. *Id.* at 365-368 (oral contract from early October 1972 involved salary throughout October 31, 1973, and onwards). Both here and in *Mapes*, the plaintiffs fully performed under their respective contracts. *Id.* For this reason, *Mapes'* holding, that one party's complete performance of a contract will exempt such a contract from the statute of frauds, should equally apply here. *Id.* at 367-68.

¶ 28    Defendant also argues that the First District's decision in *Roti v. Roti*, 364 Ill. App. 3d 191 (2006) mandates a different result. There, in seeking to enforce an oral agreement that would have provided the plaintiff with an interest in certain real estate, the plaintiff argued that his "full performance" under the contract precluded an application of the statute of frauds. *Id.* at 194. Although the court there recognized that the court in *Reiss v. El Bauer Chevrolet Co.*, 96 Ill. App. 2d 266 (1968) had previously held that " '[t]he [s]tatute of [f]rauds is no defense to an executed contract of employment," the *Roti* court found that such a principle was "irreconcilable with more recent cases," such as *Mariani v. School Directors of District 40*, 154 Ill. App. 3d 404, 407 (1987); *Promodromos v. Howard Savings Bank*, 295 Ill. App. 3d 470, 476 (1998); and *Payne v. Mill Race Inn*, 152 Ill. App. 3d 269, 278 (1987), which all purportedly established that "employment contracts usually do not qualify for the performance exception to the Frauds Act." *Id.* at 198. Pursuant to these cases, the *Roti* court found that the plaintiff's allegations of performance did not qualify for an exception under the Statue of Frauds.

¶ 29    However, because the *Roti* case conflated the concepts of *partial* performance and *full* performance, we decline to follow the decision. Again, in *Roti*, the plaintiff alleged that he had *fully* performed under the applicable oral contract. *Id.* at 194. As such, the plaintiff relied on *Reiss* for the proposition that *fully* executed contracts are not voided by the statute of frauds. *Id.* at 198. Nonetheless, in reaching the opposite conclusion, the *Roti* court relied on *Mariani*, *Promodromos*,

and *Payne,* which, unlike *Reiss*, did not involve the *full* performance of an alleged contract, but instead, *partial* performance. *Id.*; *Mariani*, 154 Ill. App. 3d at 407-408 (holding that there was "no merit in [the] defendants' partial performance argument"); *Promodromos*, 295 Ill. App. 3d at 476 (where the plaintiff argued that "his partial performance based on the contract" entitled him to compensation); *Payne*, 152 Ill. App. 3d at 277-278. Because the *Roti* case essentially ignored relevant caselaw such as *Reiss*, while embracing irrelevant caselaw such as *Mariani, Promodromos,* and *Payne*, we decline to follow it. For all of these reasons, we agree with plaintiff that the circuit court erred in dismissing count II of its second amended complaint.

¶ 30                    B. Count III—Promissory Estoppel

¶ 31    Next, because plaintiff's promissory estoppel count was neither precluded by the statute of frauds or the applicable statute of limitations, the circuit court also erred in dismissing count III of plaintiff's third amended complaint. "Promissory estoppel is a common-law doctrine adopted to permit the enforcement of promises that are unsupported by consideration, such as gratuitous promises, charitable subscriptions, and certain intrafamily promises." *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 91. Under Illinois law, the statute of frauds bars all claims of law and equity, as they relate to the alleged contract at issue. *Rosewood Care Center, Inc. v. Caterpillar, Inc.*, 366 Ill. App. 3d 730, 735 (2006). For this reason, one cannot rely on the doctrine of promissory estoppel to recover damages under a contract that falls within the statute of frauds. *Id.*

¶ 32    Furthermore, "actions on unwritten contracts, expressed or implied, *** shall be commenced within [five] years next after the cause of action accrued." 735 ILCS 5/13-205 (West 2018). While the 10-year statute of limitations applicable to written contracts includes an express tolling provision, whereby any payment made pursuant to a written agreement tolls the applicable

limitations period, the Code's five-year statute of limitations applicable to oral contracts contains no similar provision. 735 ILCS 5/13-206 (West 2018); 735 ILCS 5/13-205 (West 2018). Regardless, our supreme court has established that this "partial payment doctrine" also tolls the applicable statute of limitations for unwritten contracts. See *Miller v. Cinnamon*, 168 Ill. 447, 456 (1897) (finding that, for purposes of an unwritten agreement, "[a] part payment of the debt will take it out of the statute [of limitations], whether the payment is made in money or by goods and chattels"). Various Illinois appellate court decisions have relied on *Miller's* logic in more recent decades. *In re Franke's Estate*, 124 Ill. App. 2d 24, 33 (1970) (citing *Miller* for the proposition that certain "evidence [may take a] case out of the operation of the statute [of limitations]"); *St. Francis Medical Center v. Vernon*, 217 Ill. App. 3d 287, 289 (1991) (finding that five-year statute of limitations for unwritten contracts was tolled by "part payment of a debt *** such that it commences to run from the date of last payment").

¶ 33    Here, in his promissory estoppel count, plaintiff alleged that, as a result of his reliance on defendant's various promises under the oral agreement, plaintiff was prevented from starting his own architectural firm. Plaintiff argues that neither the statute of frauds nor the applicable five-year statute of limitations for unwritten contracts bars this count, because the limitations period was tolled when defendant made "some payments" to plaintiff "through December 22, 2017." Consequently, because the five-year statute of limitations for the instant agreement began to accrue on December 22, 2017, plaintiff contends that the promissory estoppel count, which was filed on March 28, 2019, falls within the applicable limitations period.

¶ 34    Asserting that the statute of frauds *does* apply to the oral agreement, defendant argues that plaintiff's promissory estoppel count cannot be used to salvage any relief under the oral agreement. Because plaintiff's promissory estoppel count accrued "nearly [12] years" before this action was

filed, defendant additionally contends that the action is barred by the five-year statute of limitations pertaining to oral contracts. Defendant further asserts that the partial payment exception does not apply to the oral agreement.

¶ 35    Defendant's arguments lack merit. First, as we have already discussed, the statute of frauds does not bar enforcement of the oral agreement, so the statute does not defeat plaintiff's promissory estoppel count. *Rosewood Care Center*, 366 Ill. App. 3d at 735. Furthermore, despite the fact that section 13-205 of the Code does not contain any language providing that a partial payment of a debt tolls the five-year statute of limitations governing unwritten agreements, we are nonetheless bound to follow our supreme court's precedent, which has allowed the limitations period to be tolled under identical circumstances. *Miller*, 168 Ill. at 456. Accordingly, we reject defendant's arguments that the statute of frauds and the statute of limitations precluded plaintiff from bringing its promissory estoppel count.

¶ 36    Defendant nonetheless suggests that the partial payment exception to the statute of limitations is inapplicable here, because plaintiff "has not pled facts that [defendant] was paying down a past due debt." Specifically, defendant cites *Kopel v. Board of Education*, 1 Ill. App. 3d 1083, 1086-1087 (1971), to contend that "[n]ot all money that changes hands between a debtor and creditor suffices to toll the limitations period[,] because '[t]here must be an actual and affirmative intention' to reduce a particular debt before a court may imply at law a new promise to pay that debt." We disagree that *Kopel* bars application of the partial payment doctrine in the instant matter.

¶ 37    First, despite defendant's contentions, plaintiff *did* allege that, by making payments to plaintiff through December 2017, defendant was paying down a debt owed under the oral agreement. Specifically, pursuant to the oral agreement, plaintiff alleged that he agreed to stay

employed by defendant for ten years under the same terms of the original, written agreement. The written agreement stipulated that, in exchange for his services, plaintiff would be entitled to a certain salary each year, to be increased by an amount determined from the previous year's inflation rate, or, in an amount proportionate to any increase of defendant's shareholder's salaries. Moreover, in any years in which defendant's shareholders received bonuses, the written agreement specified plaintiff would "receive a bonus equal to 10% of the sum of all such shareholder bonus amounts." Accordingly, these same terms applied to the oral agreement, and after each year of plaintiff's service under the oral agreement, defendant owed plaintiff his base salary, any contractual salary increases, and bonuses. However, while plaintiff acknowledged that "[d]efendant paid [p]laintiff" during the duration of the oral agreement, he also alleged that defendant failed to pay the "annual salary increases" and the "10% of [defendant's] [s]hareholder's bonuses" under the oral agreement. As such, plaintiff *did* allege that defendants paid him only a portion of the total amounts due under the oral agreement, and, as a result of this, defendant's partial payments of the total amount owed to plaintiff extended the applicable statute of limitations.

¶ 38      Defendant makes the somewhat misleading argument that *St. Francis* is inapplicable, because there, "it was unclear whether a five- or 10-year limitation applied." We disagree. While the *St. Francis* decision alluded to certain written agreements and itemized hospital statements, the court there clearly analyzed the doctrine of partial payments as it relates to the five-year statute of limitations applicable to unwritten contracts:

> "[The p]laintiff argues that[,] although the hospital care and services were rendered in 1984, *the five-year limitation on actions on unwritten contracts provided in section 13-205* presents no bar where [the] plaintiff's exhibit A shows payments were received on the account through February 1990.

It is clear that part payment of a debt tolls the statute of limitations such that it commences to run from the date of last payment. *** [T]he payment in February 1990 *caused the five-year statute of limitations* to run from that date, and the filing of plaintiff's first amended complaint in May 1990 was within the period." *St. Francis Medical Center*, 217 Ill. App. 3d at 289.

Regardless, even if *St. Francis* did not involve the five-year statute of limitations, *Miller* certainly did. 168 Ill. at 448.

¶ 39 Defendant also confusingly argues that *St. Francis* is alternatively inapplicable because there, "the alleged payments that tolled the limitations period were designedly made to reduce a prior existing debt." Defendant continues, "Here, in contrast, [plaintiff] does not allege that [defendant] made any payments on a debt that existed prior to 2006."

¶ 40 Defendant's argument is illogical. In *St. Francis,* the partial payment doctrine tolled the five-year statute of limitations because the defendants made *subsequent* payments on a debt arising under the alleged, unwritten contract. *St. Francis*, 217 Ill. App. 3d at 289-290 (unwritten agreement for hospital services that was created in 1984 was not barred by five-year statute of limitations where defendants made payments under the agreement through February 1990). Similarly, here, plaintiff pleaded that the parties entered into the oral agreement in December 2006, and that, defendant only paid plaintiff portions of his earned compensation under the oral agreement through December 2017. Thus, *St. Francis* suggests that the five-year statute of limitations for any claims arising out of the oral agreement, such as those presented in plaintiff's promissory estoppel count, commence from the date of the last December 2017 payment. *Id.* at 289. For all of these reasons, we conclude that the circuit court erred in dismissing count III of plaintiff's third amended complaint.

¶ 41                               C. Count IV—Defamation

¶ 42    Next, we agree with defendant that the circuit court properly dismissed count IV of plaintiff's second amended complaint. "A statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with her." *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996). To state a claim for defamation, a party must present facts indicating that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of the false statement to a third party, and that the publication caused damages. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). Defamation actions fall into one of two categories: 1) defamation *per se* claims; and 2) defamation *per quod* claims. *Green*, 234 Ill. 2d at 494-495.

¶ 43    "A statement is defamatory *per se* if its harm is obvious and apparent on its face." *Id.* at 491. Illinois courts have categorized five types of statements that are defamatory *per se*: 1) words imputing that the plaintiff has committed a crime; 2) words that impute that the plaintiff has been "infected with a loathsome communicable disease;" 3) words that impute that the plaintiff "is unable to perform or lacks integrity" in carrying out his or her profession; 4) words that impute that a plaintiff "lacks ability or otherwise prejudices" the plaintiff in his or her profession; and 5) words imputing that the plaintiff has engaged in adultery or fornication. *Id.* at 491-492. "Although a complaint for defamation *per se* need not set forth the allegedly defamatory words in *haec verba*, the substance of the statement must be pleaded with sufficient precision and particularity so as to permit initial judicial review of its defamatory content." *Id.* at 492. A plaintiff alleging defamation *per se* does not need to make a showing of special damages to recover. *Bryson*, 174 Ill. 2d at 88.

¶ 44    On the other hand, claims of defamation *per quod* may be brought in two circumstances. *Id.* at 103. "First, a *per quod* claim is appropriate where the defamatory character of the statement

is not apparent on its face, and resort to extrinsic circumstances is necessary to demonstrate its injurious meaning." *Id.* "A *per quod* action is also appropriate, however, where a statement is defamatory on its face, but does not fall within one of the limited categories of statements that are actionable *per se*." *Id.* Under either type of defamation *per quod* action, the plaintiff must plead and prove special damages. *Id.*

¶ 45     Here, plaintiff argues that the trial court erred in dismissing count IV of the second amended complaint because he "adequately pled that [d]efendant made such defamatory [*per se*] statements about him to the architectural clients that he had provided high quality architectural services to for more than 30 years." To this point, plaintiff argues that two separate statements that defendant purportedly made to the administrators of Harper College and the College of Lake County constituted defamation *per se*. First, plaintiff asserts that, by telling the colleges that "[p]laintiff was erratic to the point that [d]efendant ordered all of its offices in the country to lock their doors to prevent [p]laintiff's violent entry" (first statement), defendant "called into question [plaintiff's] ability to perform complex architectural work." Second, by informing the colleges that plaintiff's locked-out status had " 'undermined [p]laintiff's access to the resources necessary to perform substantial architectural commissions for major clients such as' themselves" (second statement), plaintiff suggests that defendant's statement "imput[ed] a lack of ability in his profession as a result of the locked-out status."

¶ 46     We disagree. First, defendant's first statement concerning plaintiff's perceived erraticism and locked-out status do not fall into any of the five recognized categories of statements that are defamatory *per se*. *Green*, 234 Ill. 2d at 491-492. Simply put, by characterizing plaintiff as being "erratic," defendants in no way insinuated any deficiencies in plaintiff's abilities as an architect.

¶ 47    Second, as defendant points out, plaintiff never argued before the trial court that defendant's second statement, that plaintiff's locked-out status undermined plaintiff's access to necessary resources, was defamatory *per se*. Instead, in responding to defendant's motion to dismiss, plaintiff only argued that defendant's first statement constituted defamation *per se*. Accordingly, because the argument was never presented to the trial court, it is forfeited. *BMO Harris Bank, N.A. v. Malarz*, 2021 IL App (2d) 190984, ¶ 18. Plaintiff seemingly acknowledges that he never made this express argument, but contends that doing so was unnecessary, because his second amended complaint already created the inference that defendant's second statement constituted defamation *per se*. However, even if this were true, we note that plaintiff also failed to make this specific argument before the trial court when arguing against defendant's motion to dismiss, meaning it too has been forfeited. *Id.*

¶ 48    Forfeiture notwithstanding, plaintiff never alleged in the second amended complaint that any portion of the second statement was false. Instead, plaintiff only suggested that defendant's characterization of plaintiff as being erratic was false, alleging that "[t]here was no legitimate basis to make the statements, *and indeed they were false in their implication that [p]laintiff, who is not a young man, is violent at all or erratic as feigned by defendant*." (Emphasis added.) Accordingly, plaintiff has failed to plead the requisite elements of defamation *per se* or *per quod* with regards to this second statement. *Green*, 234 Ill. 2d at 491-492.

¶ 49    Furthermore, because defendant's first statement concerning plaintiff's erraticism was a nonactionable opinion, that statement also could not form the basis of a defamation *per quod* claim. "Only statements capable of being proven true or false are actionable; opinions are not." *Moriarty v. Greene*, 315 Ill. App. 3d 225, 233 (2000). However, where a falsified fact is couched in terms

of an opinion, the underlying fact remains actionable. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 2 (1990).

"Courts consider several factors in determining whether a statement is actionable: (1) whether the statement has a precise and readily understood meaning; (2) whether the statement is objectively verifiable as true or false; and (3) whether the statement's literary or social context signals that it has factual content." *Rose v. Hollinger International, Inc.*, 383 Ill. App. 3d 8, 12 (2008).

¶ 50     Here, concerning the first factor, plaintiff acknowledges that the term "erratic" "ha[s] no precise meaning in the abstract," but argues that it has a "very precise meaning in the context of the [d]efendant's statements that it had ordered all of its offices locked because of [p]laintiff's allegedly erratic nature and to prevent [p]laintiff's violent entry." Specifically, plaintiff argues that, by telling others that plaintiff was so erratic that he needed to be locked out of defendant's offices, defendant "convey[ed] that [p]laintiff had committed some act or acts that caused the [f]irm to fear for its employees' safety." However, plaintiff seems to be conflating the first and third *Rose* factors with one another, as the first factor does not examine the factual context behind a defendant's statement, only whether the statement, in and of itself, has a precise and readily understood meaning. To this point, however, plaintiff concedes that the term, "erratic," has "no precise meaning in the abstract." Plaintiff has therefore failed to provide any basis for us to find that the first *Rose* factor weighs in his favor, and, by admitting that the term "erratic" lacks a fixed meaning, suggests that the factor weighs *against* his favor. *Rose*, 383 Ill. App. 3d at 12.

¶ 51     With regards to the second *Rose* factor, plaintiff argues that defendant's statement is verifiable, because "whether [p]laintiff had committed some act or acts that caused [defendant] to fear for its employees' safety" is capable of being proven true or false. Again, though, defendant

never insinuated that plaintiff had already acted out in a violent manner to threaten its employees. By examining the veracity of the purported context behind defendant's first statement, defendant now conflates the second and third *Rose* factors with one another. Regardless, there is no way to objectively prove whether someone is "erratic," because, as plaintiff acknowledged, the term does not have a fixed meaning. Instead, the term encapsulates defendant's *subjective* perception of plaintiff, which, by definition, is not *objectively* verifiable. Furthermore, defendant's mention of plaintiff's possible "violent entry" concerns a subjective fear about a hypothetical future event, which, again, cannot be objectively verified. Instead, the only verifiable fact that could be gleaned over from defendant's first statement is that plaintiff was locked out from defendant's offices. However, this truthful portion of defendant's first statement—which plaintiff acknowledged as being true—cannot form the basis of plaintiff's defamation count. *Green*, 234 Ill. 2d at 491. For these reasons, the second *Rose* factor also weighs against plaintiff's arguments. *Rose*, 383 Ill. App. 3d at 12.

¶ 52     Regarding the final *Rose* factor, plaintiff has repeatedly argued that the context behind defendant's first statement signals factual content, in that defendant insinuated that plaintiff has already violently acted out against its employees. However, plaintiff has alleged no facts illustrating the context from which we may infer any factual content in the purported defamatory statements. Accordingly, defendant has failed to show that the final *Rose* factor supports his arguments. For all of these reasons, we find that the circuit court did not err in dismissing count IV of the second amended complaint.

¶ 53                    D. Count VI—Unjust Enrichment

¶ 54     Next, because count VI of the third amended complaint contained viable theories of unjust enrichment, the circuit court erred when it dismissed the count in its entirety. "The doctrine of

unjust enrichment underlies a number of legal and equitable actions and remedies, including the equitable remedy of constructive trust and the legal actions of *assumpsit* and restitution or quasi-contract." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160 (1989). To state a cause of action for unjust enrichment, a plaintiff must plead the following elements: 1) that the defendant has unjustly retained a benefit; 2) that the defendant's unjust retention has led to the plaintiff's detriment; and 3) that the "defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Id.*

¶ 55    Here, under count VI of the third amended complaint, plaintiff alleged that defendant was unjustly enriched in four general ways: 1) that, from 1997 through the present, defendant received increased architectural commissions and prestige tied to defendant's use of plaintiff's surname in its trade name; 2) that, as a result of plaintiff working for defendant, defendant received the benefits of plaintiff's professional skills; 3) that defendant avoided having to compete with plaintiff from January 1, 1997, through December 26, 2006, as well as from December 27, 2006, through December 22, 2017; and 4) that defendant sought and received a $500,000 loan from plaintiff. Plaintiff argues that defendant's enrichments have led to his detriment, in that: 1) plaintiff's name is now linked with defendant's "substandard architectural work; 2) plaintiff has expended money in securing defendant architectural commissions; 3) plaintiff lost personal work equipment; 4) plaintiff lost time that he could have otherwise used to start a new firm; and 5) plaintiff's reputation suffered after defendant's rumors about him began to circulate to prospective clients.

¶ 56    On appeal, plaintiff argues that the unjust enrichment count was improperly dismissed because it was not barred by the statute of frauds, because it was sufficiently pleaded in the alternative and therefore did not involve express contract allegations, and because there was only a "rebuttable presumption" that, as a result of a prior stock sale, defendant owned the rights to use

plaintiff's name. In response, defendant argues that count VI was properly dismissed because it "could not be [pleaded] without referring to a contract that governed the relationship between the parties," and because the count "improperly alleges matters that are governed by contract." Because we have already found that the statute of frauds does not operate to bar enforcement of the oral agreement, we only address the remaining arguments in turn.[1]

¶ 57                    1. Benefits Tied to Plaintiff's Name

¶ 58    First, the portions of plaintiff's unjust enrichment count predicated upon defendant's use of plaintiff's name are precluded by the existence of an express contract. A party cannot successfully plead a claim of unjust enrichment concerning a subject that is governed by an existing agreement between the parties. *C. Szabo Contracting, Inc. v. Lorig Construction Co.*, 2014 IL App (2d) 131328, ¶ 25.

¶ 59    While a party may nonetheless plead a claim for unjust enrichment in the alternative to a breach of contract claim, "the unjust enrichment claim cannot include allegations of an express contract." *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 25. Even where an express contract is

---

[1]The parties also dispute whether "other allegations in the unjust enrichment claim should be dismissed," as defendant argues that count VI "include[d] allegations of injuries to [plaintiff] that were made in other counts," without any explanation as to how these injuries benefited defendant. We agree that, in alleging the elements of unjust enrichment, a plaintiff's alleged detriments should directly result from a defendant's unjust retention of a corresponding benefit. *HPI Health Care Services, Inc.*, 131 Ill. 2d at 160. However, as plaintiff has alleged that each benefit that defendant unjustly retained is tied to a corresponding detriment suffered by plaintiff, defendant's argument is irrelevant. See *id.*

not mentioned within a claim of unjust enrichment, dismissal of such a claim may nonetheless be appropriate if it incorporates allegations of an existing contract and a copy of such a contract is attached to the complaint. *Guinn v. Hoskins Chevrolet*, 361 Ill. App. 3d 575, 604 (2005).

¶ 60    Here, while moving to dismiss plaintiff's unjust enrichment count, defendant produced a certain stock sale agreement and stock redemption agreement that were executed in 1997, whereby plaintiff agreed to sell all of his shares in the defendant company to several of defendant's employees and to defendant itself. Otherwise put, at that time, plaintiff sold his business—which incorporated his surname as its trade name—to defendant. Because "[t]he transfer of property and effect of a business carries with it the exclusive right to use such trademarks or trade[]names as have been used in such business," plaintiff sold defendant the exclusive right to continue using his former business's trade name—which incorporated his surname—when selling all of his shares to defendant and defendant's employees. *Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill. App. 3d 99, 109 (1984). Consequently, defendant's continued use of plaintiff's surname as its trade name is governed by express contracts—the stock agreements—and plaintiff cannot successfully bring a theory of unjust enrichment based on defendant's continued use of the name. *C. Szabo Contracting, Inc.*, 2014 IL App (2d) 131328, ¶ 25.

¶ 61    Nonetheless, plaintiff argues that the stock purchase agreement did not transfer any rights concerning plaintiff's trade name to defendant, because pursuant to trademark law, " 'one cannot 'sell' to another the right to the name as a symbol of personal skill and ability.' " However, our search of the record reveals that plaintiff never raised this specific argument to the circuit court. Accordingly, the argument is forfeited. *BMO Harris Bank*, 2021 IL App (2d) 190984, ¶ 18.

¶ 62    Plaintiff also seeks to distinguish *Thompson*, which we cite above, in three respects. First, plaintiff points out that, unlike here, the disputed trade name in *Thompson* did not involve anyone's

actual surname. Second, defendant argues that, unlike here, "the business seller [there] did not dispute that the [name] was transferred." Third, defendant argues that *Thompson* is inapplicable because "the actual issue [there] was priority of use as against a third party."

¶ 63    First, while plaintiff is correct that *Thompson* did not involve a trade name that incorporated one of the parties' surnames, *Allegretti v. Allegretti Chocolate-Cream Co.*, 177 Ill. 129 (1898), a case on which *Thompson* relied, did. There, in determining whether the appellee had the sole right to use the familial trade name, "Allegretti," our supreme court specifically found that "[t]he transfer of the property and effects of a business carries with it the exclusive right to use such trade-marks or trade-names as have been used in such business," despite the fact that the alleged trade name incorporated several of the parties' actual surnames. *Id.* at 132.

¶ 64    Concerning plaintiff's second and third arguments, plaintiff has failed to provide any meaningful explanation as to how the aforementioned distinctions, which seem to be cosmetic in nature, render *Thompson* inapplicable. As such, although plaintiff may be correct that differences exist between *Thompson* and the instant matter, these distinctions, in and of themselves, do not negate an application of the case to the matter at hand.

¶ 65    Next, citing *Dovenmuehle v. Gilldown Mortgage Midwest Corp.*, 670 F. Supp. 795 (N.D. Ill. 1987), which defendant relied upon before the circuit court, plaintiff argues that the sale of a business only creates a "rebuttable presumption" that "the rights in a trade name transfer to the buyer of a business." As such, plaintiff argues that, because he has "not been allowed any opportunity to develop any contrary evidence to rebut that presumption, unlike [the parties] in *Dovenmuehle*," "granting a motion to dismiss was improper, and the case should have proceeded to the normal discovery period." Plaintiff further argues that the circuit court's dismissal of count VI "essentially amount[ed] to a ruling that [p]laintiff did not plead evidence in his [t]hird

[a]mended [c]omplaint to rebut a presumption," and that such a dismissal was improper, because at this stage of litigation, he was "required only to allege the ultimate facts necessary to state a cause of action."

¶ 66    Because plaintiff never actually requested an opportunity to conduct additional discovery prior to the circuit court's resolution of the motion to dismiss, however, the argument has been forfeited. *BMO Harris Bank, N.A. v. Malarz*, 2021 IL App (2d) 190984, ¶ 18. Still, plaintiff contends that the following language, taken from the report of proceedings on defendant's motion to dismiss, establishes that plaintiff requested that the motion to dismiss be denied or postponed so that the parties could conduct more discovery:

"And then regarding the *Dovenmuehle* arguments and the arguments that they can show these contracts and have an affidavit of somebody that says, yeah, these are contracts as proof that my client intended to sell his name or that the name was part of the contract when it was completely silent, that's not appropriate. Because what they're doing is they're arguing—we have pled facts on one side, and against our pled facts on one side, and against our pled facts what they're arguing are rebuttable presumptions based on principles of contract law.

We should have the parties argue what the contracts are. We should have testimony as far as offer, acceptance, performance. And where there's vague terms or where the parties argue vaguery [*sic*], well, then we need testimony to determine what the parties actually agreed here."

We disagree that the above language served as a formal request for additional discovery, so as to properly preserve the issue. Instead, plaintiff only suggested that the circuit court should deny defendant's motion to dismiss because defendants purportedly failed to ascertain the legal effects

of the parties' stock sale agreement. Plaintiff never even mentions the prospect of additional discovery. For these reasons, again, the argument is forfeited. *Id.*

¶ 67 Furthermore, plaintiff's contentions that the circuit court's dismissal of count VI wrongfully "amount[ed] to a ruling that [p]laintiff did not plead evidence in his [t]hird [a]mended [c]omplaint to rebut a presumption" is incorrect. To this point, while plaintiff correctly contends that, in filing his complaint, he was only required to "allege the ultimate facts necessary to state a cause of action," defendant was still entitled to argue that plaintiff's claims were barred by another affirmative matter—here, the contracts purportedly governing defendant's use of plaintiff's name. *McLean v. Rockford Country Club*, 352 Ill. App. 3d 229, 238 (2004); 735 ILCS 5/2-619(9) (West 2018). In its motion to dismiss, defendant presented the court with the stock sale and stock redemption agreements in conjunction with caselaw establishing that the documents gave defendant the right to use plaintiff's trade name, which, again, incorporated plaintiff's surname. Accordingly, defendant carried its burden to avoid the legal effect of plaintiff's argument under section 2-619(9) of the Code (735 ILCS 5/2-619(9) (West 2018)). At that time, the burden shifted to plaintiff to offer any evidence to rebut defendant's legal conclusion. *Turner v. 1212 S. Michigan Partnership*, 355 Ill. App. 3d 885, 892 (2005). Plaintiff, however, in responding to the motion to dismiss, failed to carry this burden by rebutting defendant's arguments, and never requested an opportunity to conduct more discovery on the matter. Therefore, the circuit court's dismissal of count VI was not due to a lack of evidence alleged in the complaint, but, instead, due to plaintiff's failure to carry his burden of persuasion while responding to the motion to dismiss. *Id.* For all of these reasons, the circuit court properly dismissed all portions of plaintiff's unjust enrichment claim concerning defendant's use of plaintiff's name.

¶ 68 2. Benefits Tied to Plaintiff's Professional Skills and Lack of Competition

¶ 69 Next, while the circuit court correctly dismissed the portions of plaintiff's unjust enrichment count stemming from plaintiff's employment from January 1, 1997, through December 26, 2006, it erred in dismissing the portions of count VI alleging that defendant was unjustly enriched through plaintiff's employment from January 1, 2007, through December 22, 2017. Again, a party cannot successfully plead a claim of unjust enrichment concerning a subject that is governed by an existing agreement between the parties. *C. Szabo Contracting, Inc.*, 2014 IL App (2d) 131328, ¶ 25.

¶ 70 Here, in the third amended complaint, two of the bases of plaintiff's unjust enrichment count—defendant's receipt of plaintiff's professional skills and the lack of professional competition with plaintiff—were predicated upon plaintiff's employment by defendant during two applicable periods of time—from January 1, 1997, through December 26, 2006, and December 27, 2006, through December 22, 2017. Pertinently, plaintiff alleged that, during these times, defendant unjustly benefited from "[p]laintiff's considerable leadership skills running the company he founded while serving as its [c]hairman," from defendant's avoidance of any direct competition with plaintiff, and from its representations that "[p]laintiff was an active, valued member of its team."

¶ 71 Concerning plaintiff's completed work from the first relevant time period, January 1, 1997, through December 26, 2006, plaintiff alleged that, "in 1997, upon certain promises, [p]laintiff sold his shares in [defendant company] and agreed to work [for defendant] *pursuant to a certain consulting agreement*." (Emphasis added.) A copy of the consulting agreement was attached to the complaint, specifying that it would be in effect from January 1, 1997, through December 31, 2006. Thus, because plaintiff has admitted the existence of an employment contract that was in effect during this first alleged time period under count VI, any benefits tied to plaintiff's employment

during this time are not actionable under a theory of unjust enrichment. *Id.*; *Guinn*, 361 Ill. App. 3d at 604. Accordingly, the circuit court properly dismissed the portions of plaintiff's unjust enrichment count that were predicated upon plaintiff's employment from January 1, 1997, through December 31, 2006.

¶ 72    Plaintiff nonetheless argues that he should have been allowed to amend this count to "clarify that it sought a recovery for unjust enrichment in the event the 1997 consulting agreement is held invalid or unenforceable, or to modify the time period at issue so that the unjust enrichment count only pertains to the time period from January 30, 2007[,] to the present." Defendant cites no authority in support of this argument, and the argument was never raised before the circuit court, meaning it is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *BMO Harris Bank, N.A. v. Malarz*, 2021 IL App (2d) 190984, ¶ 18. Regardless, we note that, where multiple avenues of relief are brought forth within the same count of a complaint, they should be treated as independent claims that all require adjudication as if they were pleaded in separate counts. *Gray v. ITT Thorp Corp.*, 70 Ill. App. 3d 797, 799-800 (1979); See *Brown v. K.J.S. Co.*, 189 Ill. App. 3d 768, 771 (1989). Accordingly, plaintiff was not required to amend his pleadings to separate the distinct claims made under this count. *Id.*

¶ 73    On the other hand, because plaintiff did not allege the existence of an express employment contract that was in effect from January 1, 2007, through December 22, 2017, plaintiff's theories of unjust enrichment stemming from this time period remained actionable. "The elements of a contract are an offer, a strictly conforming acceptance to the offer, and supporting consideration." *Brody v. Finch University of Health Sciences/The Chicago Medical School*, 298 Ill. App, 3d 146, 154 (1998). In the context of employment contracts, a promise may be taken as an employment offer where it is clear enough to lead an employee to reasonably believe that an employment offer

has in fact been made. See *Ivory v. Specialized Assistance Services, Inc.*, 365 Ill. App. 3d 544, 546 (2006) (finding that an employee manual can create enforceable contract rights where "traditional contractual elements are present," including a clear promise that an employee takes as an offer). An employee accepts such an offer when he or she begins working for the employer, and the employee's "continued employment" should be seen as consideration for the employment contract. *Id.* "As with any contract, the terms of an employment contract must be clear and definite." *McInerney*, 176 Ill. 2d at 485.

¶ 74    Here, in count VI of plaintiff's third amended complaint, plaintiff alleged that, on December 28, 2006, defendant "made certain promises to [p]laintiff[,] which caused him to continue working at [d]efendant." Plaintiff continued, alleging that "[d]efendant's promises *** actually did induce [p]laintiff to continue working exclusively for the benefit of [d]efendant from December 28, 2006[,] until December 22, 2017."

¶ 75    We do not read these allegations to mean that the parties entered into an express employment agreement during this later time period. In order to characterize defendant's promises as an offer for purposes of an employment contract, one would necessarily need to know whether the language of defendant's promises was clear and definite enough to lead plaintiff to reasonably believe that an employment offer had been made. *Ivory*, 365 Ill. App. 3d at 546. However, in count VI, plaintiff never discussed the actual language that defendant purportedly used in making its "promises." Accordingly, a reviewing court could not properly find that defendant's promises *reasonably* led plaintiff to find that an employment offer had been made, as necessary to plead the existence of an express contract governing the parties' working relationship from January 1, 2007,[2]

---

[2] Although defendant purportedly made its promises to plaintiff on December 28, 2006,

through December 22, 2017. Because plaintiff did not allege the existence of an express contract concerning the parties' working relationship during this time, the circuit court erred when it dismissed the portions of count VI concerning any benefits defendant may have received from plaintiff's employment from January 1, 2007, through December 22, 2017. *Id.*; *Guinn*, 361 Ill. App. 3d at 604.

¶ 76                                3. Benefits Tied to the $500,000 Loan

¶ 77    Next, because the $500,000 loan that plaintiff provided to defendant was also governed by an express contract, the circuit court correctly dismissed the portions of plaintiff's unjust enrichment count that were based on the loan. In addition to the stock sale agreement, defendant also attached a promissory note to its motion to dismiss, which seems to have been made for plaintiff's benefit, establishing that defendant's officers would pay $500,000 to "THE BANK OF WAUKEGAN ON BEHALF OF [PLAINTIFF]." On appeal, plaintiff makes no arguments attacking the validity of the promissory note, its subject matter, or whether it in fact operated to govern the reimbursement of the $500,000 back to plaintiff. Accordingly, because defendant has shown that an express contract existed between the parties concerning the loan, the loan could not serve the basis as a claim of unjust enrichment. *Guinn*, 361 Ill. App. 3d at 604. Moreover, as an alternative basis of dismissal, we note that plaintiff never alleged that he suffered any detriments as a result of the $500,000 loan, meaning he additionally failed to make a proper claim of unjust enrichment relating to the loan. *HPI Health Care Services, Inc.*, 131 Ill. 2d at 160. For all of these

---

the parties' written agreement, which was directly referenced under count VI and attached to the third amended complaint, continued through December 31, 2006, meaning plaintiff's theories concerning any work completed before this date are nonactionable. *Guinn*, 361 Ill. App. 3d at 604.

reasons, the circuit court correctly dismissed the portions of count VI relating to the $500,000 loan that plaintiff made to defendant.

¶ 78                                    E. Sanctions

¶ 79    Finally, we turn to the arguments presented in defendant's cross-appeal concerning the circuit court's award of sanctions. Defendant argues that the circuit court abused its discretion when it "arbitrarily imposed a $[3000] sanction" with respect to plaintiff's former conversion count. Defendant suggests that, because plaintiff's conversion count formed "the cornerstone" of the underlying lawsuit, the circuit court erred in awarding defendant less than the full amount of expenses defendant incurred in litigating the count. Defendant additionally argues that the circuit court abused its discretion when it "calculated the sanction imposed" without first holding a hearing to determine what may constitute "the appropriate sanction."

¶ 80    Plaintiff responds, first arguing that, because defendant failed to immediately object to the trial court's ruling as to the $3000 sanction or file a motion to reconsider thereafter, defendant has forfeited any arguments that it was entitled to a higher award. Plaintiff further argues that the $3000 sanction was appropriate here, where defendant failed to present the court with "sufficient evidence to show that a higher amount was reasonable." Plaintiff also points out that, in imposing the $3000 sanction, the court had reviewed all of the parties' applicable pleadings, transcripts of relevant depositions, and pertinent case law in correctly concluding that "an evidentiary hearing was unnecessary." For the following reasons, we find that the circuit court did not abuse its discretion in imposing the $3000 sanction onto plaintiff.

¶ 81    Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) addresses sanctions, providing:

> "The signature of an attorney or party constitutes a certificate by him that he has read [a] pleading, motion or other document; that to the best of his knowledge, information, and

belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."

The rule also authorizes courts to impose sanctions on lawyers who violate its terms. Ill. S. Ct. R. 137 (eff. Jan. 1, 2018). Still, while a circuit court may impose sanctions when the rule is violated, it is not required to do so. *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 15. A circuit court has sound discretion in imposing sanctions under Rule 137, and its decision will not be overturned unless, in imposing the sanctions, the circuit court has abused its discretion. *Id.* "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 82 First, we disagree with plaintiff that defendant forfeited any arguments on appeal concerning the amount of the circuit court's sanction. Here, in arguing that defendant is "barred from raising this issue for the first time on appeal," plaintiff contends:

"when the [circuit court] announced that it found a $[3000] sanction award to be appropriate, [d]efendant made no argument that a higher amount was warranted. Defendant did not object to the $500 per hour rate that the [circuit court] set or to the six hours of time that the [circuit court] determined should be included in the fee calculation. Defendant did not file a [m]otion to [r]econsider the $[3000] fee award in the [circuit court]."

¶ 83 We disagree. Again, on appeal, a party forfeits any arguments that were not previously raised before the circuit court. *BMO Harris Bank, N.A.*, 2021 IL App (2d) 190984, ¶ 18. In defendant's memorandum in support of its motion for sanctions, which was filed in the circuit

court, defendant explicitly argued that, as a result of plaintiff's frivolous conversion claims, "sanctions should be imposed [against plaintiff] *in an amount equal to the attorney's fees and other expenses that* [defendant] *incurred in connection with the conversion claim.*" (Emphasis added.) Defendant now makes this same argument on appeal, asserting that it was entitled to the full amount of expenses incurred in defending itself against plaintiff's conversion count. Because the argument was previously raised before the circuit court, it was preserved for appeal. *Id*.

¶ 84    Next, we agree with plaintiff that defendant's "cornerstone" argument is forfeited because defendant did not make such an argument before the circuit court. *BMO Harris Bank, N.A.*, 2021 IL App (2d) 190984, ¶ 18. Defendant seemingly recognizes that it did not previously raise the argument, but contends that the argument cannot be forfeited because the circuit court did not afford defendant an opportunity to make the argument when it denied defendant's request to file a fee petition and failed to hold a corresponding evidentiary hearing. We disagree, as defendant surely could have raised this argument while arguing its motion for sanctions.

¶ 85    Forfeiture aside, even if we were to agree with defendant that, at the time it filed its motion for sanctions, plaintiff's conversion count had become the "cornerstone" of the instant lawsuit, this would not mean that defendant is entitled to every cent it argues was spent in defending itself against the conversion count. Instead, the circuit court retained discretion to impose sanctions if it chose to do so, in an amount it found to be appropriate. Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018); *Kennedy v. Miller*, 221 Ill. App. 3d 513, 525 (1991) (holding that trial court was "free to determine the appropriate sanction" for a violation of Rule 137); but see *Rios v. Valenciano*, 273 Ill. App. 3d 35, 41 (1995) (rejecting the circuit court's sanction award because it did not reimburse the plaintiff for the totality of his incurred costs).

¶ 86    In arguing that the circuit court failed to sufficiently compensate defendant for all of its claimed expenses once the conversion count became the "cornerstone" of the instant litigation, defendant also cites *Heckinger v. Welsh*, 339 Ill. App. 3d 189, 193 (2003), to argue that the circuit court improperly "focused on the fact that [plaintiff] voluntarily moved to dismiss his complaint shortly after his deposition." There, we found that, "[e]ven if a party withdraws [an] offensive pleading, he or she is still accountable for the damage done by violating Rule 137." Here, by imposing a $3000 sanction onto plaintiff, the circuit court *did* hold plaintiff accountable for violating Rule 137. Accordingly, the circuit court's decision did not run afoul of *Heckinger*. *Id.*

¶ 87    Finally, we disagree with defendant that the circuit court erred in failing to hold a hearing to determine the appropriate sanction for plaintiff's violation of Rule 137. " 'Although an evidentiary hearing should always be held when a sanction award is based upon a pleading filed for an improper purpose, a hearing is unnecessary if the sanction award is due to the unreasonable nature of the pleading based on an objective standard.' " *Garlick v. Bloomingdale Township*, 2018 IL App (2d) 171013, ¶ 54 (citing *Hess v. Loyd*, 2012 IL App (5th) 090059, ¶ 26).

¶ 88    After hearing the parties' arguments concerning defendant's motion for sanctions, the circuit court expressly found:

> "[A]lthough an evidentiary hearing should always be held when a sanction award is based upon a pleading filed for an improper purpose, a hearing is unnecessary if the sanction award is due to the unreasonable nature of the pleading based on an objective standard, and that is what the [c]ourt found here."

Defendant does not dispute the circuit court's finding that the instant sanction was not based on an improper purpose. Therefore, pursuant to *Garlick*, an evidentiary hearing was not required in the instant matter. *Garlick*, 2018 IL App (2d) 171013, ¶ 54.

¶ 89    Defendant argues that *Garlick* is inapplicable, because there, "the *Garlick* court merely recognized that a separate evidentiary hearing on the amount of sanctions was not necessary in that case because the party seeking sanctions had already presented an affidavit and invoices to the trial court detailing the fees and expenses it incurred as a result of the violations [of] Rule 137." Defendant apparently reasons that, because there were no similar affidavits or invoices presented to the circuit court here, the circuit court was required to hold an evidentiary hearing before issuing any sanctions. Defendant further argues that our interpretation of *Garlick* runs contrary to the holding of *Law Offices of Brendan R. Appel, LLC v. Georgia's Restaurant and Pancake House, Inc.*, 2021 IL App (1st) 192523, ¶ 59.

¶ 90    However, defendant mischaracterizes the *Garlick* decision. There, after stating that an evidentiary hearing is only required where a pleading has been filed for an improper purpose and not in instances where sanctions resulted from "the unreasonable nature of the pleading," the court clearly and unequivocally held, "In this case, because [the] plaintiff's claim was moot, *it is clear that his complaint was unreasonable under an objective standard. Thus, no evidentiary hearing was necessary.*" (Emphasis added.) *Id.* This holding in no way conflicts with *Appel*, which never contemplated the specific issue of whether an evidentiary hearing is required under similar circumstances. *Id.*

¶ 91    Defendant additionally argues that, by failing to hold an evidentiary hearing on the matter, the court failed to "weigh[] the usual factors for awarding attorneys' fees as a sanction," including: "(1) [A]ll of the activities that [defense] counsel was forced to undertake solely in connection with the frivolous conversion claim[;] (2) the skill and standing of the attorney employed[;] (3) the nature of the case[;] or (4) the difficulty of the issues involved." Defendant goes on, arguing that "[t]he [c]ircuit [c]ourt also erred when it failed to make any inquiry into whether the expenses

actually incurred by [defendant] to defend against the conversion claim bore a reasonable connection to the litigation or reflected usual and customary charges." However, defendant points to no authority requiring the circuit court to consider these factors, and defendant also fails to explain how any consideration of these factors would have altered the circuit court's judgment. As a result of defendant's failure to develop this argument or support it by relevant authority, it has been forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Vancura*, 238 Ill. 2d at 372.

¶ 92 In a further attempt to avoid *Garlick's* rationale and our resulting affirmance of the circuit court's sanction, defendant recharacterizes its argument in its reply brief for the cross-appeal, now asserting that the circuit court erred in denying defendant an opportunity to file a fee petition outlining the total of its costs resulting from plaintiff's conversion count. However, as alluded to above, defendant did not sufficiently present this argument in its initial brief. There, in one sentence supporting its argument concerning the prospect of an evidentiary hearing, defendant fleetingly suggested that the circuit court also "erred when it refused to allow [defendant to] submit a fee petition," without any accompanying citation to authority establishing as much. Resultingly, this unsupported, undeveloped argument was forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1., 2020); *Vancura*, 238 Ill. 2d at 372; *Lake County Grading Co., LLC v. Village of Antioch*, 2014 IL 115805, ¶ 36 (vague allegations of error do not satisfy Rule 341(h)(7)). Therefore, defendant cannot now argue in its reply that "the circuit court erred when it refused to allow the firm to submit a fee petition." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1., 2020); *Vancura*, 238 Ill. 2d at 372.

¶ 93 Defendant unconvincingly seeks to avoid forfeiture by insinuating that its new arguments concerning the fee petition were responsive to contentions raised in plaintiff's response brief. Pursuant to Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020), an appellant may reply to any issue raised in the appellee's response brief, even if the appellant failed to first raise the issue in

its opening brief. *Rome v. Commonwealth Edison Co.*, 81 Ill. App. 3d 776, 780 (1980). Here, in presenting its improper fee petition argument, defendant suggests that it is responding to "[t]he crux of [plaintiff's] argument with respect to the sanctions issue[,] *** that [defendant] waived the argument that it should have been permitted to file a separate fee petition after the [c]ircuit [c]ourt held that [plaintiff] and his counsel both violated Rule 137." However, while plaintiff noted in passing that "[d]efendant's counsel appeared for the hearing on [its] [m]otion for [s]anctions without having submitted or prepared a fee petition," it made no arguments as to whether defendant should have been allowed to file a fee petition, or whether defendant waived this argument on appeal. Instead, plaintiff argued that "[d]efendant made no argument in the [t]rial [c]ourt that the $[3000] sanction was unreasonable or that a higher award should have been made," and that "[d]efendant therefore cannot raise this argument for the first time on appeal." By misrepresenting plaintiff's contentions, defendant has created a strawman argument in an attempt to avoid forfeiture. We will not condone such tactics by considering this new argument, which, again, has been forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1., 2020); *Vancura*, 238 Ill. 2d at 372. For all of the above reasons, we find that the circuit court did not abuse its discretion in imposing its $3000 sanction.

¶ 94                                        III. CONCLUSION

¶ 95    For the reasons stated, we affirm the judgment of the circuit court of Lake County as to count IV, as well as the circuit court's imposition of sanctions. We reverse and remand the circuit court's judgments as to counts II, III, and VI.

¶ 96    Affirmed in part, reversed in part, and cause remanded.